1

**11 CV 8256**

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------X

ANNE C. RANKEL, AND FOR CLAIRE RANKEL,

CARLA RANKEL AND CHRISTINA RANKEL

                          Plaintiffs,                                    COMPLAINT

                                                                         JURY TRIAL

             -against-                                                   DEMANDED

COUNTY OF WESTCHESTER, ASSISTANT COUNTY

ATTORNEY, FAY ANGELA JONES, DON ROSENBERG,

VOGEL & ROSENBERG, et. al.,

----------------------------------------------------------------X

RECEIVED
NOV 14 2011
PRO SE OFFICE

PLEASE TAKE NOTICE, that the undersigned will bring the above
summons and complaint before this court on or about on the 21th day
Of November, 2011, pursuant to 42 U.S.C. Sections 1983, 1985 (2) (3),
1986, and 1988.

## JURISDICTION

FIRST: This action if brought pursuant to 42 U.S.C. Sections 1983, 1985,
(2) (3), 1986, and 1988 and the First, Fourth, Fifth, Sixth, Eighth, and
fourteenth amendments. Jurisdiction is founded on 28 U.S.C. Sections
1331 and 1343 (1) (2) (3) (4) and the fore mentioned statutory and

Constitutional provisions. Plaintiff further invokes the pendent jurisdiction of this Court to consider claims arising under state law.

SECOND: The amount in controversy exclusive of interest and costs exceed the sum of $ 10,000.00

Parties

THIRD: Plaintiffs are citizen of the United States and are life-long resident of the State of New York, County of Westchester.

Anne C. Rankel, and for the minor Claire Rankel who is under the age of 18 years old and Carla Rankel and Christina Rankel

Plaintiffs address is 20 Sun Hill Rd. Katonah, New York, 10536

FOUTH: That the defendant, The COUNTY OF WESTCHESTER

The individual defendant and each of them performed all of the herein alleged acts for and in the name of the defendant, the COUNTY OF WESTCHESTER. That each of the above named defendants acted in their official capacity under color of law.  That at all times each individual defendant above were all employed by the COUNTY OF WESTCHESTER, and acted in their official capacity under color of law,

and performed all of the alleged acts for and in the name of the COUNTY OF WESTCHESTER. That each defendant was acting in such capacity as the agent, servant and employee of the defendant, COUNTY OF WESTCHESTER, They are all sued individually and in their official capacity, and under color of law.

Defendants, VOGEL & ROSENBERG, and DONALD ROSENBERG

That at all times between September 18, 2001 through February 23, 2011, the defendants all conspired to deprive the plaintiffs federal protected rights secured under the 1st, 4th, 5th, 6th, 8th and 14th amendments of the United States Constitution. The defendants sent emails, faxes, letters, phone calls back and forth to one another to deprive plaintiffs of their federal protected rights. Including communications and conversations in Court to deprive the plaintiffs their guaranteed rights to a jury trial. That each of these defendants had personal knowledge of the on-going conspiracy to deprive the plaintiffs of their Constitutional Rights, and each involved individually or in concert with one another. Including denying plaintiffs the right to the enjoyment of life, liberty and the pursuit to happiness, denial of due process of law, denial of equal protection of law, denial of a trial, denial of proper discovery, denial of the plaintiffs federal protected rights to council or effective council, bad faith, fraud, conspiracy to commit fraud, collusion, code of ethics violations, breach of contract, legal malpractice, negligence, slander, defamation of character, refusal to obey 2 Supreme Court Judges Orders to pick a jury, failure to train and failure to Supervise County employees, including the law firm of Vogel & Rosenberg's failure to train and Supervise their employees to act in good faith, failing to provide a duty of care to their clients. The two defendants Donald B. Rosenberg and Assistant County Attorney Jones

conspired in the Court to get Plaintiffs case dismissed by laying out a plan while they sat together in Court after attorney Rosenberg's Order to Show Cause was denied by judge Scheinkman, SCJ  See Exh.


Fifth:                                Statement of Claim


On or about on September 18, 2001, we contacted attorney Donald B. Rosenberg of the law firm of Vogel and Rosenberg to handle a case against Bellevue Hospital, Westchester County, Dept of Social Services, and its employees. The case was in regards to constitutional rights violations, negligence, and malpractice of Bellevue Hospital in miss-diagnosing our daughter Claire Rankel, who at the time was 6 years old. The hospitals lab results stated that Claire had extremely high levels of arsenic when in fact she really had Lyme disease and a normal seafood diet that was organic in nature. See reports. We had taken Claire to Bellevue Hospital on the advice of Dr. Belkin who treated her in his Croton on the Hudson office. See exh. The NOTICE OF CLAIM was filed within the 90 day statute of limitations but attorney Rosenberg failed to respond to the 50-H hearing notice that Robert R. Rankel had handed to him in his office on September 18, 2001. After the plaintiffs Retainer agreement was signed, attorney Rosenberg never gave the plaintiffs a copy. The case dragged out over 10 years without a trial and without a proper investigation or a proper discovery of the case.  The case was never prepared for trial and no witnesses for the plaintiff were ever contacted by plaintiff's attorneys, Vogel & Rosenberg.  The plaintiffs were told on the very eve of trial to get another attorney after the law firm of Vogel & Rosenberg had intentionally screwed up the

plaintiff's case to the point that the case could not be settled or afforded a trial. Honorable Nicholas Colabella, SCJ ordered that attorney Rosenberg pick a jury or he would dismiss the case on a Fault Dismissal pursuant to 22NYCRR section 202.27 which gives the plaintiffs one year to set aside the dismissal for good cause. The judge was furious and referred the matter to the Grievance Committee. See Exh.

Both defendants sat together and spoke about getting the case dismissed. They even spoke about attempted murder charges when they knew that the plaintiff's and their family were wrongfully accused.

Sixth:                          AS and For A First Cause of Action

The Plaintiff repeats and re-alleges each and every allegation contained in paragraphs numbered FIRST through FIVE as if more fully set forth herein.                " Under Color Of  Law "

That the Plaintiffs federal protected rights have been violated due to the defendant's bad faith, fraud, conspiracy, and failing to provide a certain degree of care as would have a reasonable prudent person would have and should have done under the same or similar conditions.  Because of these facts the plaintiffs were injured.
The Defendant Donald B. Rosenberg falsely advertised himself as: "The Legal Pit Bull" on his web site. He told the court that he could not pick a

jury because the plaintiffs' father maybe charged with attempted murder, which he knew was false, as did the assistant County attorney.

Seventh:  The defendants, The County of Westchester failed to properly train and supervise their employees to uphold the law, they failed to act in good faith by allowing their employee Fay Jones to lie before the Court and conspire to commit fraud by teaming up with the plaintiff's attorney, Donald B. Rosenberg to get the matter dismissed at any cost. The defendants used every dirty trick in the book just to get the case dismissed while the plaintiff's suffered repeatedly. It's like that old saying: "Don't get hurt twice" Well the plaintiff's attorney made sure that there was no trial and made the kids suffer even further mental anguish. The kids were all minors at the time that they were taken away by CPS who were contacted by Bellevue Hospital because of what they had thought was high levels of arsenic poisoning, which was false. It turned out to be lab error, and the hospitals failure to differentiate which type of arsenic, if any, was causing Claire to being sick.  See Exh.

While under the care and custody of Westchester County, the kids, Claire, 6, Carla 8, Christina 14 were assaulted and abused while in different group homes from February 1, 2001 to February 28, 2001.

Eighth:  That the County Of Westchester was directly responsible for the injuries caused to each plaintiff while under their care and custody.

Ninth: That the said charges were false and slanderous, and plaintiffs federally protected rights under the 1st, 4th, 5th, 6th, 8th and 14th amendment were denied. That on February 23, 2011, a Fault Dismissal was caused by the defendants in this matter intentionally and recklessly without any justification. This was a complete cover up by defendants.

Tenth:  That by reason of the injuries sustained by the plaintiffs, Anne Rankel, Claire, Carla and Christina Rankel as aforesaid, they have been damaged in the amount of  two million dollars, ($ 2,000,000,00 ) from each of the defendants separately, and individually.

Eleventh:  The Plaintiff repeats and re-alleges each and every allegation contained in paragraphs First through Tenth as if more fully set forth herein.        "Under Color of Law "

Twelfth:                    As For A Second Cause of Action

That the aforesaid conduct by the defendant's violated the plaintiff's Constitutional rights under the 1st, 4th, 5th, 6th, 8th and 14th amendments to the United States Constitution. Plaintiff was denied his right to equal treatment, denial of the right to be free from unreasonable searches and seizure of their properties, plaintiffs were denied their right to a jury trial, and the right to face their accusers, and plaintiff's had the legal right to be free of any form of detention. Plaintiff was denied the right under the United States Constitution by each defendant the enjoyment of life, liberty, property and freedom from their deprivation

without due process of law or the denial of equal protection of law under the 5th and 14th amendments. Plaintiffs were deprived of their right to be free from humiliation, slander, defamation of character, and intimidation secured by fear or threats made by the defendants. Plaintiffs were denied the right under the 8th amendment from summary and cruel and unusual punishment caused by the defendant's misconduct and their failure to train and supervise their employees.

That by reason of the foregoing, the plaintiff has been damaged in the sum of two million dollars by each of the defendants separately and individually and under color of state law.  ($ 2, 000, 000, 00).

Thirteenth:            As and for a Third Cause of Action

Plaintiff states that the defendant, the County Of Westchester maliciously and wrongfully prosecuted the plaintiffs, Anne C. Rankel for an erogenous crime that was never committed and the matter dismissed at the family Court level and on the criminal level as well. Wherefore the plaintiffs demand payment for their losses and injuries suffered by the defendant's wrongful acts. Wherefore the plaintiffs have been damaged in the sum of Two Million Dollars. ($ 2,000, 000, 00).

Fourteenth: The plaintiff repeats and re-alleges each and every allegation contained in paragraphs numbered First through Thirteenth as if more fully set forth herein. "Under Color of Law."


As and For a Fourth Cause of Action


Fifteenth: The Plaintiffs also are claiming breach of contract, negligence by Donald B. Rosenberg and legal Malpractice. Wherefore the plaintiff has been damaged in the sum of two million dollars ($ 2, 000, 000, 00.) by each defendant separately and individually under color of law.  The law firm of Vogel & Rosenberg is also held liable for their actions or a lack thereof under other federal laws that may apply in this matter.


Sixteenth: The Plaintiff repeats and re-alleges each and every allegation contained in paragraphs numbered First through Fifteenth as if more fully set forth herein.  "Under color of law."


As and For A Fifth Cause of Action


Seventeenth:

   The Defendants had no justification in law but were instead gratuitous, illegal and improper in their actions. The defendant's failed to uphold the law by falsely and wrongfully accusing our family of arsenic poisoning. Our family was slandered, wrongfully accused,

wrongfully charged and our children made to suffer at the hands of these defendants who are guilty of conspiracy and fraud.

 The defendants the COUNTY OF WESTCHESTER failed to train and supervise their employees which wrongful acts of the COUNTY employees are attributable to the COUNTY's failure to train or Supervise, Which caused the plaintiffs to being injured. The degree of neglect by the government entity was tantamount to deliberate indifference. The COUNTY also had a policy or a custom of enforcing unconstitutional County directives, procedures and protocols, and selectively targeting certain individuals by the use of threats, and selectively prosecuting people without just cause and in bad faith without any justification. The COUNTY never properly investigated this matter, nor did attorney Rosenberg or the law firm of Vogel & Rosenberg. They never once spoke to our expert witnesses or our other witnesses in this matter who could have testified at trial.

Wherefore: The Plaintiffs have been damaged in the sum of two million dollars by each defendant separately, and individually. ($2, 000, 000, 00) The plaintiffs were all completely innocent yet the County of Westchester and Vogel and Rosenberg teamed up to get the case dismissed intentionally and deliberately with callous disregard for the safety and wellbeing of the minor children. Attorney Rosenberg had a fiduciary duty to protect the plaintiffs from further harm and he failed in his legal and ethical duties and responsibilities as an attorney to uphold the law. He didn't even have the common decency to protect our children from further harm. That's why he never met with them in that 10 year period that he represented us.

Eighteenth:


The Plaintiff repeats and re-alleges those paragraphs numbered First through sixteenth as if more fully set forth herein. "Under Color of Law"


### As and For a Sixth Cause of Action

Nineteenth: That each defendant owed the plaintiff a duty of care, as would a reasonable person would have done under similar conditions. That the alleged acts of the defendants were a deprivation of plaintiff's constitutional rights, privileges and immunities and which said acts were carried out under color of law. The defendants had no justification in law but were instead gratuitousness, illegal and improper. Each defendant subjected the plaintiffs to the said deprivation intentionally, willfully, and purposefully without reasonable or probable cause or in good faith did cause the plaintiffs damages in the sum of two million dollars separately and individually by each defendant. ($ 2, 000, 000, 00).


Twentieth: The plaintiff repeats and re-alleges each and every allegation contained in paragraphs numbered First through nineteenth as if more fully set forth herein.  "Under Color Of Law".


Twenty-one            as For a Seventh Cause of Action

The defendants are liable under other sections of federal law. Christina Rankel had been beaten while in the custody of Westchester County when she was wrongfully taken away and later taken off her medications, without her doctor's approval. It later caused her side effects from being forced off her meds without just cause.

Wherefore the plaintiff has been damaged in the sum of two million dollars ($ 2, 000, 000, 00.) by each defendant, individually and separately. Each defendant acted under color of law and had no justification in law but was instead illegal, improper, gratuitousness, and acted in bad faith. Even for arguendo if the defendants Vogel & Rosenberg were not acting under color of law, they are still liable for their actions under breach of contract, malpractice, and failure to train and failure to supervise their employees which was the approximate cause of the plaintiff's injuries. Certainly, they would be held liable under constitutional rights violations as well.

Twenty-two: The plaintiff repeats and re-alleges each and every allegation in those paragraphs numbered First through twenty-one as if more fully set forth herein. Under color of law.

Twenty-Three:          As and for an Eighth Cause of Action

The County provided no sensitivity training or constitutional law training to its employee's which yet was another factor in the plaintiffs being injured. The defendants sat with each other the whole time in the

Court proceedings and never once sat with the plaintiffs, it was like having a hostile witness in a Court room as the plaintiffs' attorney continued to lie to the Court repeatedly.

For the reasons stated above, the plaintiff has been damaged in the sum of two million dollars ($ 2, 000, 000, 00) separately and individually by each defendant under color of law.

Twenty-Four:  The plaintiff repeats and re-alleges those paragraphs numbered First through twenty three as if more fully set forth herein.

Twenty-Five:         As an for a Ninth Cause of Action

The Plaintiff Carla Rankel was assaulted and abused while in the custody and care of the Defendant, County Of Westchester. That Carla still to this day suffers from post-traumatic stress caused by the defendants, Westchester County, County attorney Jones and Vogel & Rosenberg. That because of these facts the plaintiffs has been damaged in the sum of two million dollars separately and individually by each defendant. $ 2,000,000.00.

Twenty- Sixth:  The plaintiff repeats and re-alleges those paragraphs numbered First through Twenty-Five as if more fully set forth herein.

Twenty Seventh:        As an for a Tenth Cause of Action

Plaintiffs submits that they had the constitutional right to be free from being taken away from their family, and made to suffer needlessly because of the County of Westchester's policies that are unconstitutional. That the plaintiffs lost friends, lost time from school, fell way behind in their school work and later made fun of and bullied.

Wherefore: The plaintiff has been damaged in the sum of two million dollars ($ 2, 000, 000, 00.) from each defendant separately and individually under color of law.

Twenty-Eighth: The plaintiff repeats and re-alleges each paragraph numbered First through Twenty-Seventh as if more fully set forth herein.            "Under Color of Law".

Twenty-Ninth:    As an For an Eleventh Cause of Action

Plaintiffs were deprived of their constitutional rights by the defendants lack of good faith to uphold the law and by the defendants abuse of process. Failure to exercise an accepted degree of professional service, skill, or learning, willful, wanton, or reckless, which amounts to an unreasonable lack of care rendered, whereby the defendants are all liable under color of state law, they had no justification in law, but instead were illegal, improper, deceptive, slanderous, humiliating. The defendant's continued to lie before Honorable: Scheinkman SCJ, and again before Honorable Colabella, SCJ. See exh.

Wherefore: the plaintiff has been damaged in the sum of two million dollars by each defendant separately and individually. ($ 2, 000, 000, 00).

Thirty:  The plaintiff repeats and re-alleges each allegation contained in paragraphs numbered First through Twenty-Ninth as if more fully set forth herein.    " Under Color of Law".

### As an For a Twelfth Cause of Action

Thirty-One:  The defendants interfered with the plaintiff's custody rights by failing to properly investigate the matter and failed to hire experts, failed to properly train and supervise their employees.

Therefore, the plaintiff has been damaged in the sum of two million dollars ($ 2, 000, 000, 00) from each defendant separately and individually, and under color of law, they had no justification in law but instead were illegal, improper, and negligent in failing to provide proper care as would have been used under similar conditions.

   Thirty-Two: The plaintiff repeats and re-alleges each and every allegation contained in paragraphs numbered First through Thirty-One as if more fully set forth herein.   "Under Color of Law "

Thirty-Three:          As an For a Thirteenth Cause of Action

That Jeanie Pirro the former DA of Westchester brought false charges against Anne Rankel that was dismissed. The County wrongfully accused the Rankel family of arsenic poisoning.

Wherefore, the plaintiff has been damaged in the sum of two million dollars ($ 2000, 000.00) from each defendant separately and individually.

Thirty-Four: The Plaintiff repeats and re-alleges each and every allegation contained in paragraphs numbered First through Thirty-Three as if more fully set forth herein.  "Under Color of Law "

Thirty-Five:   As for a Fourteenth Cause of Action against Each Defendant.  Under the Fourteenth amendment the plaintiffs had the protection of due process of law and the equal protection of law that is guaranteed under the United States Constitution. That those rights were violated and will continued to be violated if this Court does not address the serious nature of this matter in the interests of justice.

Plaintiff's rights to fair and equal treatment have been continually denied in this matter and no justice has been done. Therefore, we ask the Court in good faith and in the interests of justice to please take a good look at this case and allow the kids to be rightfully compensated for their losses suffered by these defendants.

  Wherefore the plaintiff has been damaged in the sum of two million dollars ($ 2, 000, 000, 00) from each defendant separately and individually.

Thirty-Six:                          Relief Requested


1.) Plaintiff seeking a complete federal investigation into this matter.


2.) Plaintiff requests complete protection for himself and his family. That the Court Order that the defendants stop bringing false charges against the Rankel family repeatedly in retaliation for this action being brought against these defendants and Order a Court injunction or restraining order be issued.

3.) Plaintiff demands a jury trial and that the case remains in Foley Square and not be transferred to the White Plains branch. The Defendants have too many political connections in Westchester.


4.) That a copy of this complaint be forwarded to the U.S. Attorney's Office for the Southern District of New York for investigation.


5.) That plaintiffs are given a fair shake in this matter.



6.) As far as the compensation and punitive damages are concerned, the plaintiff will allow the Court and jury to decide what is fair and just.  Plaintiff's wants complete reimbursement for all of our losses.

7.) Also, any future damages caused by the defendants. Including complete reimbursement of all the costs and expenses that plaintiff's and his family incurred over the past 10 years nunc pro tunc.

WHEREFORE: The plaintiff prays that his requests for relief will be granted in the interests of justice and in the furtherance of justice.

RESPECTFULLY SUBMITTED,

*Anne C. Rankel*

Dated:

November 7, 2011               Anne Rankel & Robert R. Rankel

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER
TRIAL READY PART
_____ x

Robert Rankel


              Plaintiff(s)

       -against-

County of Westchester

              Defendant(s)
_____ x

**FILED
AND
ENTERED
ON March 9 2011
WESTCHESTER
COUNTY CLERK**

# Order

Index # 18880/2003


       This Court orders dismissal of this action pursuant to 22 NYCRR section 202.27
for the plaintiff(s) failure to proceed to trial on 02/23/2011.



       THIS IS A FAULT DISMISSAL.



Dated: White Plains, New York

       3-8-11



                                              Nicholas Colabella
                                              Supreme Court Justice
                                              Trial Ready Part

To commence the statutory time period for
appeals as of right [CPLR 5513(a)], you
are advised to serve a copy of this order,
with notice of entry upon all parties.

```
┌─────────────────────┐
│       FILED         │
│        AND          │
│      ENTERED        │
│ ON__1-12__20 11     │
│    WESTCHESTER      │
│    COUNTY CLERK     │
└─────────────────────┘
```

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER - COMPLIANCE PART
--------------------------------------------------------------------------x
ROBERT RANKEL and ANN RANKEL, Individually
and as parents and natural guardians of
CARLA RANKEL and CLAIRE RANKEL, infants,
and CHRISTINA RANKEL,

                                        Plaintiffs,

                    -against-

COUNTY OF WESTCHESTER,
WESTCHESTER COUNTY DEPARTMENT OF
SOCIAL SERVICES, WESTCHESTER COUNTY
CHILD PROTECTIVE SERVICES,
WESTCHESTER COUNTY DISTRICT
ATTORNEY'S OFFICE, SHARON LOTT,
and A. GUTIERREZ (First name being unknown
and unavailable),

                                        Defendants.
--------------------------------------------------------------------------x
SCHEINKMAN, J.

**DECISION & ORDER**

Index No. 18880/03
Motion Date: Jan. 10, 2011

        The following papers numbered 1 to 8 were read on this motion by Vogel & Rosenberg,
Esqs., for an order granting it leave to withdraw as counsel for plaintiffs, granting plaintiffs 90
days from the date of service of an order relieving Vogel & Rosenberg, Esqs., to obtain new
counsel, and staying the action for 90 days.

                Order to Show Cause-Affirmation-Exhibits          1-5
                Affidavits of Service                             6-7
                Affidavit in Opposition                           8

        Upon the foregoing papers and proceedings held on January 10, 2011, the motion is
determined as follows:

        In this action, counsel seeks to withdraw from representing plaintiffs based upon alleged
and unspecified irreconcilable differences relating to litigation strategy.  Plaintiffs oppose the
motion.  Plaintiffs contend that they never discussed trial strategy with counsel, and counsel's
withdrawal on the eve of trial would severely prejudice them since they have been unable to
retain new counsel.

An attorney may only withdraw as counsel upon a showing of good and sufficient cause and reasonable notice (CPLR 321[b][2]; *Matter of Tierra*, 227 AD2d 994). The question of whether such cause exists is a matter addressed to the court's discretion (*Hunkins v Lake Placid Vacation Corp.*, 120 AD2d 199 [3d Dept]). In the present matter, counsel has failed to substantiate his claim of irreconcilable differences and plaintiffs have refuted the claim. Moreover, counsel filed a note of issue and certified the matter as trial ready on June 30, 2009, over a year ago, and now seeks to withdraw as counsel only after the matter was given a trial date. Insofar as counsel commenced this matter on behalf of plaintiffs over 2,500 days ago, allowed the matter to languish by failing to proceed to trial on two prior occasions, and has failed to show good cause for withdrawal, counsel has a duty to proceed to trial and represent plaintiffs with vigor.

ORDERED that the motion by Vogel & Rosenberg, Esqs., to withdraw as counsel for plaintiffs is denied; and it is further

ORDERED that all counsel are directed to appear for the previously scheduled trial in the Trial Ready Part, Courtroom 1200 on February 23, 2011 at 9:30 A.M.

Dated: White Plains, New York
      January 10, 2011

HON. ALAN D. SCHEINKMAN, J.S.C.

TO:

Vogel & Rosenberg
  By: Donald B. Rosenberg, Esq.
Attorneys for Plaintiff
630 Third Ave.
New York, NY 10017

Robert F. Meehan, Esq.
Westchester County Attorney
Attorney for Defendants
148 Martine Ave.
White Plains, NY 10601

Robert Rankel and Ann Rankel
20 Sun Hill Rd.
Katonah, NY 10536

cc: Elizabeth Saracino, Trial Ready Part Clerk

2

1

1    SUPREME COURT OF THE STATE OF NEW YORK
     COUNTY OF WESTCHESTER
2    ------------------------------------X
     ROBERT RANKEL,
3                 Plaintiff

4       -against-                Index No.
                                018889/2003
5    COUNTY OF WESTCHESTER,
                Defendant
6    ------------------------------------x

7                 Courthouse
                White Plains, New York
8
                February 23, 2011
9
   BEFORE:
10
                HON. NICHOLAS COLABELLA,
                Justice of the Supreme Court
11
   APPEARANCES:
12
   VOGEL & ROSENBERG, ESQS.
13   Attorneys for the Plaintiff
       630 Third Avenue
14    New York, New York    10017

15    BY:   DONALD ROSENBERG, ESQ.,
               of Counsel
16

17
   ROBERT F. MEEHAN, ESQ.
18   Attorneys for the Defendant

19

20    BY:   FAY JONES, ESQ.,
               of Counsel
21

22

23

24               Susan M. Guadagno, RPR
              Senior Court Reporter
25

Proceedings                          2

1          THE COURT: Rankel against County

2    of Westchester.

3          MR. ROSENBERG:  Donald Rosenberg;

4    Vogel & Rosenberg, 630 Third Avenue, New

5    York, New York for the plaintiff.

6          MS. JONES:  Fay Jones from the

7    Office of Robert F. Meehan; all county

8    defendants.

9          THE COURT:  Who are you?

10          THE PLAINTIFF:   I'm the

11    plaintiff.

12          THE COURT:  You don't have to be

13    here, you can sit down.

14          THE PLAINTIFF:   Okay.

15          THE COURT:  What kind of a case

16    is this?

17          MR. ROSENBERG:  This is a case

18    based on the civil rights violation.

19          THE COURT:  How long is the case

20    going to take?

21          MR. ROSENBERG:  Well, trying this

22    case may take probably a week but there is

23    an application, your Honor.  I filed an

24    application this morning, an Order to Show

25    Cause, I was told to give it to you.

Proceedings                                    3

1          THE COURT:  I didn't and I'm

2     going to tell you right out front, counsel,

3     that you are not going to be relieved, you

4     are going to try the case.  Judge

5     Scheinkman already made a ruling on this

6     case.  It's your case.  You are not going

7     to get out.  I read your letter, I don't

8     know how you can put in writing what you

9     said.  This should go to the Grievance

10    Committee.

11          MS. JONES:  Your Honor, may I

12    also be heard?

13          THE COURT:  Let him respond.

14          MR. ROSENBERG:  Your Honor, there

15    are some sensitive matters in this case.  I

16    would like a second call if you can on this

17    case, I would appreciate it.

18          THE COURT:  What are you going to

19    tell me about sensitive matters?  I'm not

20    going to let you out of the case.  You are

21    either going to try it or dismiss it.

22          MR. ROSENBERG:  I understand

23    those options, nevertheless, having that

24    notice to me I would like to make a second

25    call so I could discuss what I consider --

1             THE COURT:  Okay.

2             MR. ROSENBERG:  Thank you.

3             THE COURT:  Do you want to be

4       heard?

5             MS. JONES:  I also submitted a

6       letter to the Court, the named defendant in

7       this case Sharon Lock, she had a death in

8       the family and is not expected back in the

9       office.

10            THE COURT:  Who is this person?

11            MS. JONES:  She is a named

12      defendant in the action.

13            THE COURT:  And what about her?

14            MS. JONES:  She is on bereavement

15      leave, she is not in the office.  I also

16      submitted a letter.

17            THE COURT:  Second call.

18            *      *      *      *      *

19            THE COURT: Rankel against

20      Westchester.

21            MR. ROSENBERG:  Your Honor,

22      because of what I consider not just

23      sensitive but super sensitive statements

24      that I must make to the Court I ask that we

25      see you in the robing room.

Proceedings                                    5

1          THE COURT:  No.  Whatever you

2     have to say to me you put on the record.

3          MR. ROSENBERG:  Your Honor, I

4     really don't want to do this because its

5     too explosive.  I would appreciate, as a

6     matter of courtesy and respect, I've never

7     asked this before of any Court, I've been

8     doing this for 50 years.

9          THE COURT:  Whatever your

10    application is, if your application is to

11    get out of the case, right, that's your

12    application.

13         MR. ROSENBERG:  It's more than

14    that, your Honor and there is a reason for

15    that.

16         THE COURT:  Judge Scheinkman back

17    in --

18         MR. ROSENBERG:  I understand

19    that, your Honor.  There are totally

20    different reasons now.

21         THE COURT:  Back on January 10th

22    of this year in a scathing decision said no

23    to you.  I'm saying the same thing to you

24    now.  No, you are not getting out of the

25    case.

Proceedings                                    6

1          MR. ROSENBERG:  Okay.

2     Nevertheless, your Honor, having stated

3     that I still need to make statements to you

4     and I would appreciate it if we could do it

5     in the robing room.

6          THE COURT:  This is a public

7     courthouse.

8          MR. ROSENBERG:  I appreciate

9     that, your Honor but it is too sensitive.

10    You will understand when I make these

11    statements.  Please allow me courtesy.  I

12    would deeply appreciate it.  There is no

13    prejudice to the Court or to the

14    administration of this case.  You'll do

15    whatever you think is appropriate as a

16    disposition here but I ask you courtesy of

17    seeing you in camera.

18         THE COURT:  I don't see anything

19    to be gained by doing something outside the

20    courtroom.  This case is going to go

21    forward.  I am going to send you out to

22    pick.  If you don't pick I am going to

23    dismiss the case, it's as simple as that.

24         MR. ROSENBERG:  Your Honor, even

25    defense counsel has an application which

1    has not been adjudicated here and there is

2    something very, very special about this

3    case.

4              THE COURT:  What is your

5    application, that someone had a death in

6    the family and the person is in

7    bereavement?

8              MS. JONES:  The named defendant,

9    your Honor, she won't be available, I

10   believe, until next Monday.  She is not

11   here.

12             THE COURT: The case is going to

13   go out for trial period.  This is a 2003

14   index number.

15             MR. ROSENBERG:  Your Honor, I am

16   stating to the Court that I cannot proceed

17   on this case and I ask you, I urge you,

18   with respect, that I'm able to see you in

19   the robing room.

20             Counsel, I believe, has a

21   statement also which is super sensitive and

22   I believe that you share my request to see

23   him in the robing room.

24             MS. JONES:  Yes, your Honor.

25             THE COURT:  This is a public

1    courtroom.  If you have anything to say you

2    put it on the record period.

3         MR. ROSENBERG:  We can have the

4    record in the robing room.

5         THE COURT:  No, you are going to

6    do it in the courtroom.  I don't do things

7    in the robing room, I do things in the

8    courtroom.  So go ahead, make your

9    statement.

10        MS. JONES:  With regard to the

11   allegations in this case, this case

12   involved the arsonic poisoning of a 6-year

13   old who showed up in the emergency room

14   with extremely high levels of arsonic

15   poisoning back in 2001.

16        There was an initial

17   investigation by the DA's office at that

18   time.  Now that there is a new

19   administration, we are looking at it with

20   new eyes and they are contemplating a

21   recommendation to send it over to the DA's

22   office for a new criminal investigation.

23        THE COURT:  What's that got to do

24   with this case?

25        MR. ROSENBERG:  It's the

1       plaintiff, your Honor, that's the subject

2       of their investigation and there is a

3       recommendation that he be indicted for

4       attempted murder.

5               Your Honor, please -- there is

6       this possibility.

7               THE COURT:  The case is going to

8       go out for trial or I'm going to dismiss

9       it.

10              MR. ROSENBERG:  Under these

11      circumstances and I must advise the Court

12      and we are on the record, that given this

13      statement by counsel I must advise my

14      client to take the 5th Amendment and not to

15      respond to any questions relating to this

16      incident because it may prejudice him in a

17      potential criminal indictment for attempted

18      murder.  I must have him stand moot and I

19      will direct him not to answer any

20      questions.

21              As a result of that this case

22      will be dismissed as a matter of law for

23      failure of proof.

24              In addition, I have asked my

25      client appropriately for a disbursement

1    retainer to obtain experts in this case on

2    both the issue of toxicology and the

3    protocol that was administered by the Child

4    Protective Services.  He has refused to

5    give a disbursement retainer to my law

6    firm.  I am not, I don't believe under the

7    rules of this Court I don't believe I'm

8    obligated to pay up to $20,000 out of my

9    pocket on a case that I believe now, after

10   discovery, has no merit and furthermore, is

11   subjecting my client to a potential

12   criminal indictment for a potential murder.

13          Under all of those circumstances

14   which is set forth in my new application

15   which is not before Judge Schenkman, it is

16   not on all fours, the previous application,

17   he told me the issue of disbursements is

18   not before him and it's not a part of the

19   record on his earlier decision.  I must

20   advise the Court that I will direct my

21   client to stand moot and to plead the 5th

22   Amendment in this case.

23          In addition, because there is no

24   expert in this case, because he's refused

25   to fund this and it's been almost a year

Proceedings                                    11

1    that I've asked him about this, this case

2    will fail, in addition, for failure of

3    proof, for lack of having expert testimony.

4            THE COURT:  So you are not going

5    to go forward?

6            MR. ROSENBERG:  I will not.  I

7    cannot go forward.

8            THE COURT:  The complaint is

9    dismissed.  Any counterclaims are likewise

10   dismissed for failure to go forward.

11   Dismissed.

             *        *        *        *

                    Certified to be a true and

                    accurate transcription of the

                    within proceedings.

                    SUSAN M. GUADAGNO, RPR
                    Senior Court Reporter

ARE YOU A LEGAL PROFESSIONAL?
Visit our professional site
Law firm marketing

Search FindLaw

# Rosenberg, Donald B.

Your profile? **Update now**
Updated 10/26/2010



**Vogel & Rosenberg**
630 Third Avenue
New York, NY 10017-6738
Phone: 888-487-6735 (Toll Free)
Contact Us
http://www.vrinjurylaw.com

### Map location



View larger map/Directions »

### Hiring a Lawyer: Resources

Guide to Hiring a Lawyer
Guide to the U.S. Legal System
Researching Attorney Discipline
State Bar Associations
State Legal Aid
State and Federal Courts

### Bookshelf

Full-text books you can read for free online:

ABA Family Legal Guide
ABA Guide to Marriage, Divorce & Families
ABA Guide to Wills & Estates
Consumer Action Handbook
Don't Get Taken! Protect Yourself Legally from
Common Abuses and Rip-Offs
See All Bookshelf Titles

Summary   Qualifications   Fees   Office Information

## Lawyer Overview

**Donald B. Rosenberg has been practicing law for over 50 years. He is a seasoned trial attorney, having tried cases in the New York State Courts and the Federal District Courts in both New York and New Jersey .**

**Mr. Rosenberg has successfully litigated complex tort actions for seriously injured clients in such areas as medical malpractice, products liability, construction accidents, and wrongful death. He has also successfully assisted scores of injured clients in all areas of plaintiff's personal injury litigation, including motor vehicle accidents, tractor trailer accidents, and premises liability cases.**

**Altogether, Mr. Rosenberg has obtained millions of dollars in verdicts and settlements for his clients.**

    **1.25 million dollars tractor-trailer accident**
    **1.25 million dollars rear-end auto accident**
    **$900,000.00 surgical error resulting in common bile duct injury**
    **$900,000.00 passenger in car accident**

THE LEGAL PIT BULL

**Mr. Rosenberg is known as the "Legal Pit Bull" for his aggressiveness and assertiveness in prosecuting the claims of his clients. For the past 50 years, he has worked hard to ensure his clients get the compensation they deserve. He will work just as hard for you. Let him put his experience to work for you. Call 1.888.4VRoseLaw and talk directly to the Legal Pit Bull.**

**90% of Practice Devoted to Litigation**

## West Practice Categories

**Personal Injury -- Defense, Personal Injury -- Plaintiff, Family Law**

Next: Qualifications

## Bar Admissions

**New York, 1959**
**U.S. Court of Appeals 2nd Circuit, 1960**
**U.S. District Court Southern District of New York, 1960**
**U.S. District Court Eastern District of New York, 1960**
**U.S. Federal Courts, 1960**
**U.S. Supreme Court, 1963**
**U.S. Tax Court, 1980**

## Professional Associations and Memberships

**New York State Bar Association, 1961 - Present (Member)**

Ms. Sharon Lott, Sr. Caseworker
Child Protective Services
750 Washington Street
Peekskill, New York 10566

Re: Rankel, Claire
    DOB: 07/09/94

Dear Ms. Lott:

Please be advised that Claire Rankel who was admitted to Bellevue Hospital
Center on 01/19/01 with a diagnosis of "Arsenic Toxicity" is medically cleared for
discharge, effective today's date. As per your contacts with Ms. Rebecca
Weitman, CSW Pediatric Social Worker, the plan via your office is that this
patient can be discharged home to the family.

Since we cannot clarify the exact nature of what happened to this child we do not
agree with this discharge plan. This is why we are requesting a written clearance
from your office to release this child to the family.

Your immediate attention to this matter will be greatly appreciated.
Our fax number is 212-562-2474.

Please feel free to contact us at 212-562-6321 if you have any further questions.

Sincerely,

Margaret McHugh, MD
Director, Child Protection and Development Program

Sybil Nurse-Reeves, CSW
Coordinating Manager, Social Work

Rebecca Weitman, CSW
Pediatric Social Worker

New York City Health and Hospitals Corporation
South Manhattan Health Care Network

Department of Social Services
Kevin P. Mahon
Commissioner

Bellevue Hospital
462 First Ave.
New York, N.Y. 10016

Attention: Rebecca Weitmann                    Da   2/1/01
Social worker Inpatient Pediaatrics

Dear Ms. Weitman;

      I am writing in respconse to our conversation
Rankle. I have spoken to my Supervisor, Deborah D
investigator Gray and the Disstrict Attorney, Kathy M
reason to prevent Claire from being discharged to he

We are granting permission ffor Claire to be discharg
care of her parents Robert anad Ann Rankle .

If you are in need of any furtlher information please
Thank you for all of your suppport and concern.

Sincerelty,

Sharon Loott
Sr. Caseworrker
Child Protectivve Services
750 Washingtcon Street
Peekskill Newr York 10566

District Offices

100 East First Street
Mt. Vernon, N.Y.  10550-3442
Tel.: 665-6200

750 Washirington Street
Peekskill, N.Y.  10566-5499
Tel.: 734-48500

85 Court Street
White Plains, N.Y.  10601-4201
Tel.: 734-5840

137 Alexander Street
Yonkers, N.Y.  10701-2539
Tel.: 966-6000

Carla could not remember if she had eaten any of the fish that has allegedly made the other family members ill. Carla said she does like fish. Carla said she was feeling well, and does not remember feeling ill the past couple of weeks.

Carla is faired skinned with blond hair, she did not appear to be thin for her age.

Mr. Rankel was advised that CPS would follow up with his family.

Since Daytime CPS made contact with this family, (and ES was requested to see mother, and 9 year only) CPS is responsible for the safety assessment on this family.

It is believed that Carla will be safe in this home tonight.

                                                      Branca


Date of Event: 1/25/01          **Telephone Contact: Denise McMahon/ ACS**
Telephone call from Manhattan ASC, Denise McMahon. She informed this worker she will be the secondary worker in Manhattan. She asked what this worker want her to do. Worker asked her to interview the child, Claire and her mother Ann Rankel regarding Christine and Claire's illness.

Date of Event: 1/25/01              **Telephone call: Rebecca Wietman, Social Worker:**
Worker received a phone call from a Rebecca Wietman, social worker for Claire at Bellevue Hospital. She reported Claire is still a very ill child. She reported child was brought a roast beef sandwich the day before and the child ate it and became very ill after eating it. They are trying to get another urine from Claire to measure her blood levels.
Ms. Wietman stated the arsenic levels in the child's blood suggest she has had an arsenic ingestion more recent than September, but they are still waiting for tests to come back. She stated they should be back between tomorrow or the next day. Ms. Wietman reported there are two types of arsenic, one is natural and found in fish, the other is unnatural and very toxic.

Ms. Wietman reported the mother appears to be an abused spouse, she just has that look about her. Worker stated this agency has concerns as well.

Mrs. Wietman reported they will not be letting Claire be released until she is a 100 percent recovered and healthy. Ms. Wietman gave this worker the doctor's telephone number who is treating Claire, a doctor Steven Truab # 1-917-537-2437


Date of Event: 1/25/01                 **Telephone call: Dr. Traub NY Poison Control and**
attending physician for Claire Rankel:
Worker contacted Dr. Steven Traub, who is the treating physician for Claire.
Dr. Traub reports Claire's arsenic levels upon entering the hospital were of a level of the 400'MCG's. Dr. Traub reports a level above 50 is of major concern. Dr. Traub reported fish has levels of arsenic in them, but it is usually non toxic to humans.

Worker asked Dr. Traub about the roast beef sandwich, Claire ate. Dr. Traub reported her mother ate most of it and she did not get sick.

...worker asked Dr. Traub if Claire ingested arsenic in September would the levels be as high after 3 months. Dr. Traub responded most of the arsenic would be out of the system within the first 24 hours. After that, it has a ½ life that should have left the body within a few/several days later. Dr. Traub reported they have taken a hair sample from Claire and the test will show how many and how often Claire has ingested arsenic.

Worker informed Dr. Traub she has requested for the 16 year old child, who describes she has been vomiting since September, to been seen by a doctor today. Father agreed to take her to the hospital today for test. Worker asked if he could check it out if in fact he has done that. Dr. Traub responded he would check this information out for worker and get back to her tomorrow.

**24 HOUR /7 DAY SAFETY ASSESSMENT:**
All parties in this report have not been interviewed. Claire and mother are in Bellevue Hospital. Mother has been with her daughter Claire since her admittance to Bellevue Hospital for Arsenic poisoning on 1/19/01. ACS in New York has been assigned the case, with a requested to interview mother and child.

Christine reports she has been vomiting since 9/00 and has lost 60 lbs. Christine reports she has been to see Dr. Carsaro, who has prescribed amoxicillin for her.
Christine reports she did not eat any contaminated fish and she does not eat at home that often.

Mr. Rankel reports Christine is loosing weight because of her thyroid medication and has not been concerned with her weight loss, but has agreed to have Christine seen by a physician today, 1/24/01.

Claire Rankel, age 6 was hospitalized on 1/19/01 with Arsenic poisoning. Mr. Rankle reports his daughter Claire became exposed to arsenic after she ate some fish that was given to him by a business associate. burned last year. He reported he and the business associate had differences and he believes he tried to poison him with tainted fish laced with arsenic back in September.

Hospital reports child level of arsenic was above 400 MCG. upon admittance. Hospital report levels above 50 MCG is a concern. Dr. Truab, the physician from the hospital reported toxic levels in Claire indicate she was exposed to arsenic more recent than September. All test are not yet complete with results.

ES saw Carla Rankel on 1/24/01 and reports she appears healthy and reports she is not experiencing any symptoms of arsenic poisoning.

The children appear safe at this time. Claire remains in the hospital and is receiving treatment. All children are at risk because it as it remains unclear how Claire levels of Arsenic is so high and Christine continues to be ill. Father has agreed to have Christine tested for Arsenic poison in her system. Investigation is on going.

Date of Event: 1/26/01                    Telephone call: Dr. Belkin
Worker contacted Dr. Belkin regarding Claire Rankel. Dr. Belkin reported he saw Claire one time a couple of weeks ago. He reported she came in for a chronic cough and was told during the visit by her father that she had ingested some arsenic poisoning back in September. He reports he did a

Printed: 2/20/01                    Office of Children and Family Services

He contacted the parents and within the hour they were in route to the hospital.

Dr. Belkin reported Mr. Rankel told him about the arsenic and showed him a paper that read he had arsenic levels found in his blood and it was Mr. Rankel who mentioned the child ingesting arsenic..

Dr. Belkin reported he never saw Christine.

Date of event: 01/26/01                    Telephone call: K. McFadden
Worker received a phone call from K. McFadden from the County District Attorney's office. Mrs. McFadden wanted to know the latest up date of the Rankle case. Worker shared with her the above information and the children's dates of birth.

Telephone call: Dr. Traub
Worker received a phone call from Dr. Traub, informing this worker Mr. Rankel did come to the hospital with his daughter Christine. Dr. Traub reported Mr. Rankel called the doctor today to find an update on his daughter, Claire. Dr. Traub reported Mr. Rankel told him he was informed by supervising doctor, there was no test needed at this time for Christine and she should be seen by her own doctor.
Dr. Traub reported he has not verified this information but he will. if it isn't how Mr. Rankel reported it, he will call worker back.

Date of Event: 1/26/01                    Telephone call: Dr. Carsaro
Worker contacted Dr. Carsaro's office, who is the Rankel children's pediatrician.
Nurse for Dr. Carsaro reports Christine was seen in their office on 9/14/00, 9/16/00 and 1024/00. Child was complaining of vomiting and having loose bowels. Child reports she is vomiting 2-10 times a day. She also complained she has chronic stomach cramps on 1/24/00. It was recommended child be taken to Westchester Medical Center for further assessments. Nurse reports there was no follow through because no referral was requested.

Worker spoke with Dr. Carsaro regarding Claire and was informed Claire was seen in November. Dr. Carsaro was told by Mr. Rankel Claire had eaten fish with levels of arsenic. Dr. Casaro stated he tested Claire for arsenic levels on 11/4/00 and test came back negative on 11/6/00.

Dr. Carsaro reported Claire returned to his office on 12/26/00 for stuffiness and difficulty in breathing. Father mentions mercury ingestion. A referral was made for the child to be seen at Westchester Medical Center. Dr. Carsaro report referral was not followed through with because there never was a request for the referral form.

APPL/CW- NC- 1/25/01
CASE NAME- RANKEL, ANN
ACS# 5319374
UNIT 469
5X8- N/R
WMS- HAS ACTIVE CASE IN *WESTCHESTER COUNTY*
IM- N/R
SSN# -N/R
PLEASE VERIFY IF BOTH MAL. CHILDREN HAVE SAME BIOLOGICAL MOTHER. IF NOT, NOTIFY APPLICATION FOR PENDING CREDIT FOR COMAPANION CASE. SEE PRINT OUT.

b) **Summary of prior history and allegations: N/A**

3. List current allegations: INADEQUATE GUARDIANSHIP, LACK OF MEDICAL CARE, POISENING, NOXIOUS SUBSTANCES

*Supervisor to complete this section. Refer to page 1 of the Supervisory Tool.*

4. Time and date of SUP/CW pre-investigation conference and supervisory instructions: CASE ASSIGNED TO DENISE MCMAHON, 469-4, ON 1/25/01.

a) CONTACT THE SOURCE OF THE REPORT TO FIND OUT WHETHER THEY HAVE INFORMATION ABOUT THIS FAMILY COMPOSITION. DO THEY HAVE ANY D.O.B. FOR THE CHILDREN. IS WESTCHESTER D.A. INVESTIGATING THIS CASE. DOES THE SOURCE KNOW WHY THE FATHER BROUGHT THE CHILD TO BELLEVUE INSTEAD OF ANY OTHER LOCAL HOSPITAL.

b) CALL BELLEVUE HOSPITAL TO FIND OUT IF THE SUBJECT CHILD HAS BEEN ADMITTED IN THAT HOSPITAL.

c) IF THE CHILD IS THERE, GO TO THE HOSPITAL AND INTERVIEW THE CHILD IN PRIVATE IN REGARDS TO THE ISSUE AT HAND. WHEN DID THE CHILD GET SICK. DOES THE CHILD KNOW WHAT MADE HER SICK. EXPLORE OTHER AREAS OF POSSIBLE NEGLECT/ABUSE, SUCH AS DV, LACK OF SUPERVISION, ETC. HOW DOES CHILD GET ALONG WITH PARENTS. HOW DOES PARENTS GET ALONG WITH EACH OTHER.

d) FIND OUT FROM MEDICAL STAFF HOW LONG WILL THE CHILD BE HOSPITALIZED. HOW IS THE CHILD'S INTERACTION WITH PARENTS. WHAT IS THE PROGNOSIS FOR THE CHILD.

e) CONTACT MS LOTT, THE WESTCHESTER CPS. FIND OUT WHAT EXACTLY SHE WANTS NYC CPS TO DO. DOES SHE KNOW EXACTLY IN WHAT PART OF BELLEVUE THE CHILD CAN BE LOCATED. WHO IS THE ATTENDING PHYSICIAN, ETC.

f) CONFERENCE THE CASE WITH CPSS II, AFTER YOU INTERVIEW THE CHILD.

g) BY M. PIMENTEL, CPSS II, 469

**Ms. McMahon reported she will be entering her notes into Connections for worker to access.**

1. Who, when and how were alleged subjects notified of the report? The mother was notified on 1/25/01 in person at Bellevue hospital.

2. Basic facts about household composition (religion, source of income, primary language, resident status, culture/ethnicity, health coverage): The mother claims that neither her or her husband work. They all speak English.

3. Alleged/confirmed subject's account (address each allegation) Include name of interviewee, date and location of interview and name of other person present during interview:

_Interview with the mother, Ann Rankel, (1/25/01):_

The mother states that her daughter, Christine, has lost 10lbs. a month while under doctor's supervision. The doctor is Dr. Popovic in Bradhurst, Valhalla.   Christine was over 300lbs. and is now down to around 240lbs.  She does throw up sometimes but mostly during her periods.  As a younger child, Christine, was on Ritalin, and was in "Four Winds Hospital."  And is currently on Depico.

The mother states that the father ate fish while with the contractor who gave it to him and was violent sick after eating it.  The mother states that the contractor also sells this same li___ __ __

pt. Since then the father has gone back to time man for more
...Father brought the fish to the town lab and arsenic was
...volved in the middle of October, so far no arrest have been

Claire has been sick since Sept. She has been to see several different doctors. Dr. TTraub (917) 537-2437, had sent them here to Bellevue b/c he states that Bellevue specializes in arsenic.. Claire's Peds. Dr. is at Katonha Med. Group 232-3135. She has also been seen by Dr. Balkin in Croton and Dr. Clark in New Rochelle and the Yorktown lab.

Date of Event: 1/26/01          Telephone call: Denise McMahon/ACS
Worker received a phone call from Denise MacMan from ACS in Manhattan.
Ms. MacMan informed worker she had interviewed both Claire and her mother.
Claire stated she had eaten some fish. She, her sister, her mother and her father.. Worker asked which sister. Ms. MacMan answered her sister Christine. Claire reported she ate the most fish. Claire reported her father had gotten sick earlier after eating the fish, and some moore after dinner. Claire reported she had gotten sick too, but her mother didn't. Claire described her sister Christine has been sick since she ate the fish too. Claire reported her sister Christine has been sick for a long time too.

Claire described she had been sick since Christmas and she became violently sick after she got to the hospital. Claire reported she has seen many doctors.
Claire reported she is afraid, but could or would not say of what.

Claire reports she has her own room at her house, but her mother sleeps with her most of the time. Her sister Carla sleeps in her own room. Christine sleep at her grandfathers, because he broke his wrist. Claire could not report where her father sleeps.

Claire reported her sister Christine was really fat, but she has been sick and haas lost a lot of weight. Mrs. Rankel was also interviewed she reported Claire has been to see diifferent doctors and she mentioned a Dr. Popavich at Westchester Medical and a Dr. Hadden..   Mrs. Rankel reported Christine use to be 300lbs and she now weighs 240lbs. Mrs. Rankel attributes Christine's weight lost to her thyroid medications. Mrs. Rankle reported Christine gets sick and throws up around the time of her periods.

Date of Event: 1/26/01          Telephone call: Investigator Gray
Worker contacted Investigator Gray and informed him of findings on Claire from Dr. Carsaro in November. Worker informed him there wasn't any arsenic levels found in Claire on '11/4/00. Worker informed him she has requested for the information to be faxed to her. Investigattor Gray asked this worker to forward him the information.

Date of Event: 1/29/01          Home visit:
Worker went by the Rankel residence on a routine visit to follow up with having Chhristine seen by a doctor. Worker was greeted by Mr. Rankel. He informed worker he took Christime to Dr. Belkin today and had her tested for Arsenic poisoning. Her results should be back on Wednesday or Thursday.

Belkin's office with the results.

**Telephone call from Investigator Gray:**
Worker was called by Investigator Grray regarding the doctor's report on Claire foor a negative arsenic level in November. Worker immformed Investigator Gray papers were faxedd but the fax machine had run out of ink. Worker informormed him she will request for papers to be semt again.

Worker asked if they have spoken withh Mr. Rankel yet. Investigator Gray answered thney will speak with him tomorrow and if this workerr could get the papers faxed by then it wouldd be helpful. Worker responded she will try.


Date of Event: 1/30/01        Teleephhone call: Denise McMahon

Worker spoke with Denise McMahom from ACS.  Worker requested progress nnotes on the interview with Mrs. Rankel and Claire.. Ms McMahon stated she was typing them nonw. She said she had typed them already but she losst all her notes.

Date of Event: 01/31/01        Teleephhone call: Investigator Gray
Worker received a phone call from Sr.. Investigator Gray, who reported they had intterviewed Mr. Rankel today. He is staying with his original story where he got arsenic laced ffish from Mr. Demore.

Investigator Gray reported they also iinterviewed Mr. Demore. He described Mr. Deemore as the complete opposite of Mr. Rankel. He sstated it is hard to see Mr. Rankel and Mr. Deemore having lunch together. According to Investigattor Gray, Mr. Demore admitted Mr. Rankel ate some fish in his home and he gave him 2-3 lbs to taake home with him. Mr. Demore reported a few weeks later Mr. Rankel came back and purchased ssome fish from him, about 5lbs. Mr. Demore charged him $30.00 for the fish. Mr. Rankle reports hhe paid $15.00 for the fish.

Worker asked Investigator Gray what eexplanation did Mr. Rankel give for Claire eatimg the fish in September and then having a arsenic teest given in November that came back negativee, but comes up with a level of 961 in January.
Investigator Gray answered Mr. Rankel gave no reason, he stated he did not know.

Investigator Gray stated Mr. Rankel nevver deviated from his original story, but he haas agreed to come back tomorrow for a lie detector test. He will call worker tomorrow to let workcer know how he does.



Date of Event: 2/1/01        Telephoneee call: Rebecca Wietman
Worker received a phone call from Reebecca Wietman, the social worker from Bellewue Hospital. She informed this worker that they neeed to discharge Claire from the hospital and sfhe needed to know if they were going to release her tto her parents. Worker responded that she has spoken with

is sticking to his story about the rash. He has agreed to come back this afternoon and submit to a polygraph test. Worker informed Ms. Wietman the investigator is pretty sure he will pass, but will let this worker know either way.

Worker also informed Ms. Wietman Christine was taken to Dr. Belken on Monday to be tested for arsenic poisoning and the test results should be back today. Worker informed Ms. Wietman she will call the doctor's office and see if the results are in yet.

Ms. Wietman stated she needs a letter from this worker giving permission for them to release Claire to her parents. Worker asked if she needed it today or if they could hold off one more day. Ms. Wietman responded she would need it by the end of today.

**Date of Event: 2/01/01              Telephone call: Dr. Belkin's Office**
Worker contacted Dr. Belkin's office and spoke with the office manager. She checked to see if the test results have come back on Christine. She reported Christine's lead levels were normal, but the arsenic test has not come back yet. She suggested this worker call back tomorrow.

**Telephone call: 2/01/01**
Worker contacted the DA's office to speak with the DA. Worker was referred to K. McFadden, but she was not available. Worker left a message for her to return her call.

**Telephone call:**
Worker received a phone call from Mr. Rankel asking this worker why we have not contacted the hospital to discharge his daughter.
Worker responded she was faxing the letter of discharge right now. Mr. Rankel asked this worker if he then could go down and pick up his daughter and wife. Worker answered he could.

**Telephone call:**
Worker received a phone call back from the District Attorney's office by K. McFadden.
Worker explained to K. McFadden the hospital has called and they are ready to discharge Claire Rankel. Worker wanted to know if the DA's office was agreeable to this.

**K.** McFadden responded A. Lanzanski is in Court but she would try to reach and she would pass on the information. K. McFadden stated she will call this worker back.

**Telephone call:**
Worker received a phone call from District Attorney L. Murphy, who asked this worker to up date her on the Rankel case. Worker gave her an update of the case and she responded she did not think we could send this child home to her parents because she has an unexplained injury. L. Murphy asked this worker who her manager was. Worker responded L. Drisko. L. Murphy responded she did not know who she was and she will contact the District manger Mike Newman and call this worker.

**2/0101 Telephone call: Mike Newman:**

**2/01/01 Conference call:**
Worker was present during a conference call between this wo
manager L. Drisko to discuss the Rankel case.
Mr. Newman expressed after speaking with the DA and all o
emergency removal of all three Rankel children. Worker was
and have them accompany this worker.

**Telephone call:**
Worker contacted Bellevue Hospital and spoke with Rebecc
discharge Claire to her parents. Worker explained she has jus
removal on the Rankel children. Worker informed Ms. Weitma
her parents. Worker informed her she will fax down the paper
care and custody of the commissioner.

**2/01/01 Telephone call:**
Worker contacted the Somers State Police and spoke with Sr. Investigator Gray and informed him
we were going to do an emergency removal on the Rankel children and requested the State Police
to assist. Investigator Gray responded he would have two State Police accompany this worker.

**Telephone call: Bellevue Hospital:**
Worker contacted Mrs. Rankel and informed her the agency will be taking the children into care.
Worker explained Claire has sustained an unexplained injury and this worker has been directed to
remove the children. Worker explained Claire will probably stay in the hospital tonight and would
be picked up tomorrow.
Mrs. Rankel informed this worker her husband is on his way down to pick them up. Worker stated
she is aware of that but he will not be taking Claire home.
Mrs. Rankel asked if she could stay the night with Claire. Worker informed her that would be fine.


**Date of Event: 2/01/01:**
Worker's S. Lott and S. Berger met the State Police at the Rankel residence in Katonah. Worker
went to the Rankel residence, no lights were on in the big house, but there were lights on in Karl
Rankel Sr's residence.
Worker knocked on K. Rankel 's door and he answered. Worker asked him if Christine was at
home. Mr. Rankel responded she was not, she was at work. Worker asked what time will she be
done. Mr. Rankel responded she works until 7-8 PM. He stated she usually calls and either he or
her father will pick her up.
Worker asked Mr. Rankel if his son Robert and Carla have come back from the hospital. Mr. Rankel
responded he has not come back just yet, but should be back soon.

Worker explained she would has been directed to remove Christine and Carla and place them into
the custody and care of the commissioner. Worker informed Mr. Rankel she would go and pick up
Christine at work. Worker asked mr. Rankel if he could put some of Christine's clothing together
for her. Mr. Rankel responded he would not go into her room. He asked worker why we were
taking the children. Worker explained she could not discuss this information with him. Worker

Printed: 2/20/01                    Office of Children and Fam
2C

Workers and Police then went to the Food Emporium,, where Christine works. Workers were informed Christine left at 7:00 pm. The time was 7:55 pm.

Worker went back to the Rankel home and found Mr. Robert Rankel back from the hospital. Worker informed him workers have been directed to take Carla and Christine into care. Mr. Rankel went inside his house and came back speaking into the phone with his attorney. He explained to his attorney that we were there to remove his children. Mr. Rankel spoke with his attorney for awhile and then asked this worker to speak with him.
Worker informed him she is not allowed to speak with his attorney. Mr. Rankel asked who he could speak with. Worker informed him to speak with her director L. Drisko and gave him the number to call. Mr. Rankel gave his attorney this information and hung up the phone.

Mr. Rankel told this worker he just got back from Bellevue and that this worker told him earlier he could pick up his daughter from the hospital and then when he got it was another story. He asked why this worker did that. Worker responded when she first spoke with him she did not know she would be doing a removal. It wasn't until after she spoke with him she was told they ( the agency) would be doing a removal.

Mr. Rankel responded we had not right to take his children, he has done nothing wrong.
Worker expressed she understood how difficult this was, but still this worker had to take the children.
Worker asked Mr. Rankel if he knew where Christine was. Mr. Rankel answered he did not know. He stated she was probably with her friend.
Worker asked if he knew which friend and if he could reach her. Mr. Rankel informed this worker he did not know her friends.

Mr. Karl Rankel came outside and told worker to leave his property and that workers were trespassing. Worker informed him she would leave when she had the children. Mr. Rankel then turned to the State Police and asked them to remove workers from his property. During this time Carla came out of the grandfathers house and Mr. Rankel grabbed her by her coat and pushed her back inside.
The State Trooper responded worker had a right to be there and that he just needed to calm down. Mr. K. Rankel responded he would be calling the Police to have these workers removed from his property.

The State Police at this time called for back up units to come to the Rankel residence. Four more State Police cars arrived at the Rankel residence.

Worker asked Mr. Rankel if we could go inside so that this worker could explain to him why this worker has been directed to take Carla and Christine and that this worker needed to have him sign some papers and explain what they mean. Mr. Robert Rankel answered he is waiting for his attorney to be called back.
Worker asked Mr. Rankel where his daughter Carla was. Mr. Rankel did not respond, he stated this worker had not right to take his children. Worker expressed he was just making this process more difficult. Mr. Rankel stated he was waiting to hear back from his attorney and he went inside his father's house.

The car then backed up and left the property. Worker heard a and said so to the State Police. The Trooper flashed his flash ...er and called over the radio to have the car stopped.

Mr. Robert Rankel came back outside with the phone to his ear. It appeared he was speaking to his attorney. When they finished Mr. Rankel brought Carla out. The Police placed her into his car. Worker asked Mr. Rankel if they could go inside to sign the papers and allow worker to explain the process. Mr. Karl Rankel was present and told his son worker were not coming into his house. Mr. Rankel took workers into his house. Mr. Rankel told this worker only she was allowed in the house, not the other worker. Worker explained to Mr. Rankel she needed to have the other worker present as a witness. Workers were accompanied by a State Trooper.

Worker filled out and gave Mr. Rankel his 1028 hearing papers and explained he had the right to go to the Courts tomorrow and request for his children to be returned. Worekr informed him the address was on the paper. Mr. Rankel took that paper. Worker asked Mr. Rankel to sign the medical form so his children could receive any medical attention they needed. Mr. Rankel refused to sign this paper.
Worker filled and gave Mr. Rankel a copy of the ASFA, Adoption Safe Family Act.
Mr. Rankel told this worker he wanted her out of his house. He stood up with his arms across his chest. He would not look at the paper or take the paper from this worker . He directed this worker to just leave the paper on the floor.

Mr. Rankel started to escalate with telling this worker to leave and started to move forward towards this worker. The State Police came between Mr. Rankel and worker and asked him to calm down and move back. Mr. Rankel did back up. Worker again asked Mr. Rankel to sign the medical release. Again, he refused and asked workers to leave his house.
Worker left all the paper work on the floor and suggested Mr. Rankel to read them and if he had any questions he could call this worker.

Worker asked him if he knew where his daughter Christine was. Mr. Rankel denied he knew where she was. Worker asked if he could contact her friends to find out where she was and to ask for her to come home. Mr. Rankel told worker he did not know who her friends were, or where they lived. Worker then left with Carla and the Police.

Workers took Carla to the hospital for a physical and then took her to her placement at McClowsky's in Ossining.

Date of Event: 2/2/01

Workers S. Berger and S. Omeally went to Bellevue hospital to pick up Claire. While there workers had Mrs. Rankel sign medical releases for medical of all the children.

Workers then picked up Carla and placed both children in the same foster home.

Worker R. Ahern was directed by supervisor D. DeVeaux to go back tot he Rankel residence and see if Christine was there. Worker Ahern came back to the DO. and reported she was not there. Worker stated she spoke with Mr. Rankel who informed her she was not there and he did not know where she was, she had not come home.

Printed: 2/20/01      Office of Children and Family Services

. . . . . . . . . .ay return to the Rankel residence over the week-end to see if Christine was there and if so, for them to take her into care. Worker spoke with supervisor M. Castro, who accepted the case.

2/1/01 E.S. Manager I Charles Little was requested by Peekskill C.P.S. to make a home visit to find and remove sixteen year old Christina from the home. The nine year old child had been removed and she was taken to the Northern Westchester Hospital in Mount Kisco for blood and other tests to determine the arsenic level in her blood. The younger child was admitted and is currently in Bellevue Hospital in New York City.

The case was conferenced with E.S. worker Susan Schoen.

11:35 P.M. U.H.V. by E.S. worker to the home. Father was there by himself. He told E.S. that Christina ran away when he saw E.S. car. Father stated he did not know her whereabouts, but he had no objection to her going with E.S. Worker Schoen explained to father that the child would be taken to the hospital, so her blood could be tested. He said he was willing to give E.S. permission to have the children tested; however, he said that he had taken Christina to a lab for testing several days ago. Father was vague as to when he took the child and initially he said he couldn't remember the lab's name. He then said he had taken her to the Yorktown Labs. He had not yet received the results. Father requested the medical consent form for his nine year old daughter, Claire, which E.S. gave father and he signed.

T/C to E.S. Manager Little informing him that Christina was not in the home; father stated the child had run away.

There was no contact with Christina at this time.

Entered by Susan Schoen

2/2/01 ES requested to follow up and execute the removal of  Christina Rankel age 16.

2/3/01. Field Visit made to the  Rankel Home by ES Worker Travers.
ES Worker was unfamiliar with the case. ES Worker went to the fist house. An elderly man answered the door. He advised ES  that the Rankel's lived next door. As ES Worker was walking toward the second house, ES Worker observed a very tall, large blond female with her back to ES Worker standing by the back door of the elderly man's home using the phone. ES Worker does not know what Christina looks like. The woman appear to ES Worker to be an adult female.  ES Worker observed a hand come out of the door and tugged at the female's arm. The female than went into the house without ever turning around.

ES Worker went to the Rankel Home. Mr. Rankel was home. ES Worker could see a slim woman sitting on the sofa. Mr. Rankel immediately told ES Worker that Christina was not there. He stated she is staying at her friends home. He stated he did not know any of Christina's friends address. He stated he gave Trooper Egan this information. ES Worker described the woman that was standing a by his father in law'a house. He stated that sounds like Chrstina. He did not seem surprised when ES told him that she was in his father in law;s house. Mr. Rankel closed the door on ES Worker.

ES Worker went back to the father in law house . ES Worker knocked. No one answered.  ES Worker saw him getting wood. ES Worker approached him and asked him about the female in the blue jacket that went

ES called the State Police and requested assistance

As ES was waiting for the police. Mr. Rankel came to car. He stated he has tried to talk to his daughter but she is refusing to come into care. He stated he can not force a 16 year old to go to foster care. ES asked him if his daughter was in his father in law's house. He stated he did not know but would go look. Mr. Rankel went inside his father in law's house. He came out and said no one was in there. ES asked Mr. Rankel if he would asked his father in law if ES Worker could look in the house. Mr. Rankel went and supposedly asked him. Mr. Ranklel said his father in law told him that ES Worker could not go into his home. Mr. Rankel continue to be seemed to be overly cooperative with the situation.

ES Worker met with a Somers Police Officer and a State Trooper. ES Worker explained the situation to them. Neither one of the officers knew what Christina Rankel looks like. Trooper McCllean told ES that without an definite identification and risk to the child in the grandfather 's home the police would not enter the home. The Trooper stated ES/ CPS would need an order of access to get into the grandfather's home.  ES advised the Trooper that ES might be calling them on Sunday for assistance.

Entered by D Travers.

2/4/01 E.S. was requested to make a home visit to find and remove sixteen year old Christina from the home.

The case was conferenced with E.S. Supervisor Millie Castro.

U.H.V. by E.S. workers Tim Jones and Susan Schoen. Father answered the door; he told E.S. that Christina was not home. He stated that she ran away and he did not know her whereabouts. Father wrote a letter to the C.P.S. worker, which E.S. faxed and hard-copied to the D.O.

There was no contact with Christina at this time; father stated the child ran away from home because she did not want to go into foster care.

Entered by Susan Schoen.

**Date of Event: 2/5/01**
**Telephone call:**
Worker received a phone call from Mr. Rankel, asking this worker why she took his children. Worker explained to him the children were taken into care because Claire had sustained an unexplained injury. Mr. Rankel explained he told workers she had eaten fish that was poisoned by Arsenic from Mr. Demore.
Worker informed Mr. Rankel during this workers investigation she has spoken with the pediatrician and was informed Claire tested negative for Arsenic poisoning in November. This worker was informed by him, (Mr. Rankel) she had eaten the poisoned fish in September. Worker asked Mr. Rankel how he can explain if she had eaten the fish in September and was tested in November and the test was negative, then how did she test positive in January.
Mr. Rankel answered he did not know. Mr. Rankel asked this worker if she was calling him a liar. Worker responded she was not, but he is not able to explain how Claire had become poisoned with Arsenic. Mr. Rankel stated he has been to the Court and has requested for his children to be returned to him.
Worker responded that was his right to do.

Printed: 2/20/01        Office of Children and Family Services        Page: 20 of 28

istine was. Mr. Rankel answered he did not know, that she has

Worker asked if he has checked with her friends. Mr. Rankel informed this worker he does not know any of their numbers.
Worker asked Mr. Rankel if he hears from her, or should she come home he either has to contact worker or bring her into the DO. Mr. Rankel hung up on worker.

Date of Event: 2/06/01:
Worker went to Court for the Rankel 1028 hearing in front of Judge Cooney. Children were remanded to remain in care until 2/13/01 at 1:30 PM. The Judge ordered a family visit to be supervised at the DO. on Wednesday at 3:00 PM.

Date of Event: 2/06/01

Telephone call from Resource:
Worker was notified by the resource worker that the foster mother has made a request to have Claire and Carla removed from her home. F. M. reports she reports the girls are too much for her with the baby, who is 8 months old and she feels it is beneficial for the girls to be moved.

Telephone call:
Worker was informed by her supervisor Christine has been found and will be brought into the DO. this afternoon.

Christine was brought into the DO. at 12:45 PM.
Christine reported her father brought her to the train station on Saturday and told her to go to her mother's in the Bronx. Christine called her mother from the train station and asked her if she could come to stay with her. Her mother responded she would not take her, because she wanted nothing to do with her father.
Christine reported she called someone else who let her stay until today.

Telephone call:
Worker spoke with Sr. Investigator Gray and informed him Christine has been taken into care and reported her events..
He reported Mr. Rankel cam in over the weekend and reported her missing and filled out a missing persons report.

Date of Event: 2/7/01
Telephone call:
Worker received a phone call from CPS director Mike Newman, who informed this worker to contact Margaret Trigambi, from St. Joseph's hospital in Yonkers to arrange for Carla to be tested for Arsenic levels.
Worker contacted M. Trigambi and arranged for Carla to be tested at 12:30 PM.

Parent/Child visit:
Parent/child visit held at the D.O. Christine and Claire were brought in with by other workers at 2:00 PM. This worker was late coming back from Yonkers with Carla. Worker came back at 2:20 PM. Worker R. Ahern was in the play room monitoring the visit until this worker returned.

Worker was told by co-worker R. Ahern that Mr. Rankel was upset when he found out this worker was not there with Carla and that she had to push the button for Police assistance three times.

Claire and Carla from Andrus in Yonkers and Christina from McCloskey's. Parents were already at the D. O. when worker arrived with the children. Mother , father and Paternal grandfather were present. When worker and the children arrives at the D. O.  the two Mr. Rankel's came out to meet the children. The two younger children ran to meet Mr. Rankel and then turned to their Grandfather. The grandfather threw his hands out in front of himself and told the  girls not to come near him, because he had a sore throat. While worker was trying to everyone into the family room she stopped to tell the office Police officer to have worker S. Berger come into the playroom, when worker turned to see where Christina was both the Mr. Rankel's had her off to the side and they were talking. Worker directed them to proceed into the playroom. Ms. Berger met worker in the playroom and worker asked her to monitor the visit for a few moments while this worker went to the bathroom.

Worker re-entered the visit and heard Mrs. Berger telling Mr. Rankel he would have to speak with his worker about that. Mr. Rankel became quiet as soon as this worker entered the room.

Worker observed Mr. Rankel pumping information from Carla about where she has been placed. Carla told her father there are children there ( Andrus) who curse and fight with the other children. At one point Mr. Rankel looked this worker in her eye and told her she was going to be sorry she took his children. Worker ignored this remark.

**Date of Event: 2/28/01**
**Family Court:**
Court Petition was withdrawn today without prejudice. Petition was withdrawn due to toxicologist report that Claire's arsenic level's were with in the normal levels. Children were returned to parents.

**INV. DETERMINATION SAFETY ASSESSMENT:**
The allegations against Mr. and Mrs. Rankel for IG., Lack of medical care and Poisoning noxious substance are unfounded due to lack of credible evidence. A 1028 Family Court hearing was held on 2/28/01 and the County withdrew their Petition to keep the children in care  was withdrawn without prejudice. The county Toxicologist reported Claire's arsenic levels were within the normal levels. Honorable Judge Cooney returned the children home to their parents care  and custody on 2/28/01.
Children appear safe at this time and at low risk of harm. Case has been unfounded and closed.

**CASE DETERMINATION :**
Unfounded and closed.

FROM :                    FAX NO. :                    Jan. 22 2002 01:47PM  P1

Re: Bellevue Hospital
Notice of Claim

RECEIVED
JAN 2 2 2002

Dear Mr. Rosenberg,                    Jan 22, 02

        I personally went down to
Bellevue Hospital and hand delivere
a Notice of Claim that was
notarized on the 17th of Februar
2001. I gave it to an Employee
at the front desk at Bellevue
also I mailed a Copy to Bellevue.
this all took place between Feb 1,
20th of February 2001, on april 24,
2001 We served westchester County.
I made every effort in Good faith
t properly serve these Defendants.

FROM :                          FAX NO. :                      Jan. 22 2002 01:47PM P2

2

Claire our 7 year old was 6 at
the time Bellevue treated her
for Arsenic poisoning. What she
really had was lyme disease
which they never tested her for.
Last week Phelp's Memorial Hospital
Confirmed a high level of lyme
in her blood. These problems Claire
has had were never diagnosed
until last week. In February
of 2001 Claire had these same
problems. Even Bellevue's own
toxicologest Dr Rao stated that she
disagreed with Claires treatment.

Robert

# LIEBERMAN & LEBOVIT
## ATTORNEYS AT LAW

MITCHELL P. LIEBERMAN
LISA A. LEBOVIT
ADMITTED IN NY AND CT

MARSHALL S. BELKIN
OF COUNSEL

SUITE 210 BROOKSIDE PARK
345 KEAR STREET
YORKTOWN HEIGHTS, NEW YORK 10598
TELEPHONE (914) 962-0400
FACSIMILE (914) 962-0498

March 20, 2001

Attn.: Ann Marie Incalicchio
New York City Department of Health
Bureau of Laboratories
Retro & Immuno Division
455 First Avenue
Room 374
New York, New York 10016

Re:     Claire Rankel
        D/O/B: 07/09/94

Dear Ms. Incalicchio:

Pursuant to your telephone request, enclosed please find a duly acknowledged Authorization for Medical and Hospital Records with regard to the above referenced matter.

This firm represents the parent and legal guardian of the above captioned patient, Robert Rankel. It is our understanding that Claire Rankel received services in your institution. Kindly forward copies of the notes for her visit(s) regarding this matter together with the bill for services rendered.

Should there be a charge for the same, kindly advise. Please be advised that this request is pursuant to New York State Public Health Laws, which allows a provider $.75 per page for copies of all medical records.

If you should have any further questions regarding this matter, please do not hesitate to contact the undersigned.

Very truly yours,

MITCHELL P. LIEBERMAN

MPL/dm
Enc.
cc: Robert Rankel

FROM :                          FAX NO. :                    Sep. 23 2001 09:50AM P1

Re: New Case
      against Westchester County

RECEIVED
SEP 24 2001

Dear Mr Rosenberg

                                                    9-23-01

          Claire was taken to the
hospital the first time around
Sept 18, 2000, then again in
Oct of 2000 and Nov of 2000.
I also was getting treated at diff-
erent hospitals. The Kids started
getting Counseling and treatment
for their injuries after we got
them back home. The case in the
family Court was Completely dismissed
at the request of County attorney Fox.

Robert & Anne Rankel   20 Sunhill Rd.
                       Katonah, NY 10536
                       (914) 962-1797

                                         Sincerely,
                                         Robert Rankel

Robert R. Rankel
20 Sun Hill Rd.
Katonah, N.Y. 10536


May 23, 2011



Ms. Rebecca V. Taub
Legal Assistant
Departmental Disciplinary Committee
First Department
61 Broadway, 2nd Floor
New York, N.Y. 10006

Re: Response to Attorney Donald B. Rosenberg Answer

Dear Ms. Taub:

Please accept this response to Donald B. Rosenberg's
answer to our Grievance Complaint.  His Answer was dated
May 3, 2011.

<u>Factual Background of the Matter of Rankel v. County of
Westchester</u>

Please compare Attorney Rosenberg's original draft of the
factual background of this case dated 9/26/02.  And now look
at what he wrote as his Factual Background of the Matter of
Rankel  v. County of Westchester, dated May 3, 2011,
marked as our Exh.

On or about on Sept 18, 2000, I took my daughter Claire to
Hudson Valley Hospital because we both were feeling sick
after eating some deep sea tuna that was given to me by

Robert

-2-

D'Amore I had hired to do some work for our family after we had a house fire in Dec 1999. The Hospital said that Claire was dehydrated after running some tests and said that she had Lyme Disease.                              See Exhibit.


On October 17, 2000, I once again saw Robert D'Amore at his office/home, this time he had offered to sell a bag of Tuna for 15 dollars. At that point I was not sure if it was the Tuna that got us both sick or what, but I bought the tuna anyway and brought it over to the Yorktown Laboratory, in Yorktown Heights, New York, 10598

I spoke with Al Padovani, who was the Director of the Laboratory.  Mr. Padovani had advised me what to test for, so I told him to go ahead and do whatever testing he needed.  Then on November 2, 2000, Mr. Padovani called me at home and told me that he found trace amounts of arsenic in the sample of Tuna I had got from D' Amore.  Mr. Padovani told me that my daughter and I should both seek medical attention; and he further advised that I file a complaint
with the Yorktown Police since Robert D' Amore lived in Yorktown.

The Yorktown Police did a full investigation after I filed the complaint against Robert D' Amore.  The Tuna was transferred by the Yorktown Police to the Westchester County Laboratory for further testing, and on November 18, 2000, the Lab said that the fish tested positive for trace amounts of inorganic arsenic in a volume of 6.66 mcg. per gram.

Also on November 18, 2000, I personally took Claire to Katonah Medical Group after Al Padovani had advised me of the arsenic. I immediately took her for treatment, as he had advised me.

Then on November 29, 2000, I was called at home by Detective R.

-3-

Lienau of the Yorktown Police Dept. I went down to the Police station and spoke to Det. Lienau personally and cooperated with him throughout his whole investigation. He told me that based on his investigation of this matter and based upon where the fish was caught, that it's very possible that the fish/tuna was caught in polluted waters and that he was closing his investigation. See Exhibit encl.

On January 4, 2001, I decided to get a second opinion for Claire. She was still not feeling that well, and my wife and I wanted to get her help and treatment. I called Dr. Glenn J. Belkin, who was a local pediatrician of Croton on the Hudson. I explained everything to Dr. Belkin, and I explained that I had spoken to Al Padovani, who recommended that a 24 hour urine sample should be done for Claire by Dr. Belkin. We did just like he had advised us and the urine was returned to Dr. Belkin's office and later sent out to another Lab for further testing of heavy metals, and blood tests were done also.

On January 19, 2000, we got a call from Dr. Belkin, who stated that he just got back all the lab results, including the 24 hour urine samples. Dr. Belkin told us that Claire's arsenic levels were extremely high and that he called around to different hospitals; but only Bellevue had a full toxicology

dept.  He also stated that he had no experience in heavy metals.

Attorney Rosenberg is again mistaken; we did not wait 14 days like he contends in his papers to this Committee. Furthermore, Attorney Rosenberg never once spoke to Dr. Belkin or any of the other doctors, experts or laboratories that were directly connected to this case. He never even spoke to Dr. H. Cohen or Dr. Susan Cohen, whom I spoke to personally on May 17, 2011. They were the experts whom I had hired to do all the investigative work with respect to the Lab errors that were caused by Bellevue hospital's failure to differentiate between the 4 different types of arsenic. Over 10 years attorney Rosenberg never

-4-

once picked up the phone to call them or depose them. We had
experts who could have proven that Bellevue and Westchester County were responsible for taking away our kids.  Furthermore, Attorney Rosenberg never prepared the case for trial and Westchester County refused to settle the case. We also had medical experts that the children saw after they were released from the custody of CPS and Westchester County who could have testified at trial, but Attorney Rosenberg ("The Legal Pit Bull ") failed to include any of them in his Bill of Particulars or give a list of experts for pretrial. He never spoke to anyone from Cambridge Technical Associates, whom we hired. They just told me that Rosenberg never contacted them at any time.

When I brought Claire down to Bellevue on the January 19, 2009, they admitted her; and my wife came down and stayed with her thereafter. The roast beef wedge was for my wife, because Claire was too ill to eat anything at that point. That's the same time when the hospital had started her on chelation therapy. See Exhibits.

Bellevue Hospital contacted CPS of Westchester County because of what they had thought was extremely high levels of arsenic turned out to be in complete error due to the fact that they failed to differentiate which of the 4 different types of arsenic it was.  Not only that, but Claire had eaten Maine Lobster prior to being admitted to Bellevue Hospital which would give a high level of the organic type of arsenic that is non-harmful. See Exhibit.

This was all explained to Attorney Rosenberg, and he had the documents in the file from Cambridge Technical Associates.  Attorney Rosenberg even had marked them as an exhibit which included the fact that the 945 mcg. was organic and not the toxic type of arsenic.  Again, he is not being truthful to this Committee.  See Exhibit

Another error was Claire was 6 years old at the time and not 9 years old like Attorney Rosenberg suggests.  Her D.O.B. is July 9, 1994.

-5-

On February 1, 2 and 3rd of 2001, CPS took all 3 of our children into custody even though Bellevue had finally admitted that the arsenic levels of 945mcg could not have possibly have come from this patient and that it was Lab error. Rebecca Weitman, CSW, of Bellevue Hospital wrote on 2/1/01 in Claire's medical records:

"Thus far pt's lab & clinical data not consistent with arsenic poisoning."  Previous As level in urine which was elevated extremely unlikely or not possible to have come from this pt."

While in custody of Westchester County our children had been assaulted and abused.  The D.A. at the time was Jeanie Pirro, who charged my wife and me for alleged poisoning our own children.  We were also again wrongfully

charged with neglect in the family court petition as well as the criminal matter that went before the Grand Jury.  We were cleared of all wrongdoing, and the matter was dismissed on February 28th 2001, thanks to our new attorney Mitch Lieberman.

We finally were able to get our children back on February 28th, after our experts Dr. Harvey M. Cohen and Dr. Susan Cohen did all the testing and investigative work into what Bellevue did wrong, which was presented to Westchester County's toxicology dept.; and it was noted that Claire's levels were normal and not extremely high like they had first thought.                              See Exhibits.

Another point I'd like to make is the fact that Christina Rankel had lost her job because of all this and she was taken off her medications by CPS workers without any clearance from her doctors who were treating her prior to this whole situation.  Christina started having side effects from being taken off her medications, which Attorney Rosenberg fails to claim in any of his pre-trial papers or in the original Summons and Complaint that he filed with the Court in late November of 2003.  Also, Attorney Rosenberg never claimed this in the Bill of Particulars, nor did he ever

-6-

once speak to any of our children in this matter.  Attorney Rosenberg never listed any pre-trial list of any witnesses, nor did he contact all the doctors who had treated the kids after they were returned to our custody.

Mr. Rosenberg never kept us informed of the status of the case.  We had to call him but he would never talk about what was going on in the case. What we still can't understand is how he could allow all of our State law claims to be dismissed because he never arranged the 50-h Hearing, even after I explained that to him in Sept of 2001, when he

first took our file.  He could have easily corrected any problems when he took our file in Sept 2001, and the very first thing I gave him was the Notice of the 50 H Hearing papers, which he said he would respond to when he took the file in Sept of 2001. This was right after 9/11 when he agreed to take the case on a contingent one third retainer agreement.

Also, it was agreed that he would pay for all expenses up front. In fact, Attorney Rosenberg had always paid for all the expenses throughout the 10 years that he had the case.  It was only after he could not settle the case with the County did he realize that he would have to pay for all trial expenses. Attorney Rosenberg had this case marked ready for trial even knowing he listed no expert witnesses nor had any pre-trial list of witnesses he was going to call at trial.

He never sent a list of witnesses or expert witnesses to the County Attorney's office and there are none listed in this whole file that he sent us. Also, the file is not complete; there are documents, photos missing, some pages are unreadable, and the pages are not in any order at all. It appears as though the whole file was cherry picked and just dumped into a box. This is not the same file I handed him in Sept 2001, nor is it the original copies I gave him that I handed him.

-7-

## Retention of Rankel's Claim by Vogel & Rosenberg

On September 18, 2001, I had contacted Attorney Donald Rosenberg, and he had agreed to take the case on a one-third retainer basis. The Retainer was signed, but we never received a copy from Attorney Rosenberg until after the case was dismissed by Judge Colabella because of Rosenberg's

refusal to pick a jury on the day of our trial, February 23, 2011.

Attorney Rosenberg is again incorrect; I had the file already and handed it to him in September of 2001, when he agreed to take the case on a one third contingency basis. I had kept all the originals from day one; and the file that Mitch Lieberman had was a separate copy that I had made before he took the case. This way we could compare notes and go over documents when we spoke over the phone.

Even if the Notice of Claim was served on Bellevue Hospital directly, Attorney Rosenberg could have easily corrected it in 2001 when he took the file from me and the original papers.

The children were all minors and he could have still filed the proper Notice or late Notice upon the Health and Hospitals Corporation. Attorney Rosenberg had the file with all its papers in 2001; and he himself wrote this Affidavit and told me that I had to sign it immediately and return it to his office. After I mailed it to him he had it notarize.

The Affidavit he wrote with my name on it was not correct as far as # 7 and 8 are concerned and he obviously wrote this in Order to get himself out of trouble for failing to contact the County Attorney's office to reschedule the 50-h Hearing.

This was the very first thing that I handed him when I first came to his office on Sept 18, 2001, including the whole file. I had conversations

-8-

prior to Sept 18, 2001, with Attorney Rosenberg; and he was the one
that advised me to bring the file down to his office with the 50-H hearing notice.

There were no outstanding attorney's fees in February of 2003.  I had paid Mitch Lieberman up front a $5000 Retainer before he even took the case in Feb 2001. The only balance that I was paying was for the experts from Cambridge Technical Associates; and that was paid in full in April of 2002 on a payment plan, and not February 2003. See Exhibit.  The exhibits speak for themselves, and again this is another
untruth told by Attorney Rosenberg.


<u>Prosecution of the Matter</u>


This matter was never aggressively litigated by attorney Rosenberg, and he did allow all of our State law claims to be completely dismissed from the causes of action in our complaint.  And then he proceeded to refuse to go forward with the trial after the County refused to settle the case and he was faced with paying all the trial expenses.  Rosenberg had always advanced all the expenses in the past and nothing had changed in the case until he decided to just dump everything.

This certainly was not just cause or reasonable to refuse the courts
Decision and Order to pick a jury for trial.

None of the material parties were ever called or interviewed by
Attorney Rosenberg.  He never even interviewed or saw our 3 children who had been traumatized by the Defendants, including Bellevue Hospital, Susan Berger of CPS, and the people who worked
at the different group homes where our children had been

placed and later assaulted and abused.  How can Attorney
Rosenberg state that he did a complete Discovery of the
case when he never interviewed
                                    -9-
major witnesses who could have testified at trial?  I counted
a
total number of 8 depositions, 2 of which are by me, my wife,
my daughters Christina, Carla and Claire. 6 of them were all
of our family, 1 of Sharon Lott of CPS and 1 of Rebecca
Weitman of  Bellevue Hospital who attorney Rosenberg left
completely out of our complaint?  There is no Deposition of
A. Gutierrez, who was a listed Defendant, or anyone from
Westchester County or from the Dept. of Social Services,
who were all named Defendants in that case.  There were no
Depositions of any doctors in the case, or any social workers
who were involved in the case.

None of the laboratory experts were ever Deposed in the
case, nor were any of the Police Deposed who were involved
in the case. There was not even a Pre-Trial list of witnesses,
when this case had been marked ready for trial on more than
one occasion. Attorney Rosenberg had adjournments after
adjournments and never told us what he was doing.

Finally in 2010, when we called him, he told us that he would
not talk about the case over the phone or put in writing the
status of our case; and this went on for 9 months before we
finally got a letter saying that he wanted my wife and me to
come down to his office in Manhattan when he had an office
right in Hartsdale, NY.  I explained that my wife was still
suffering from chemotherapy and radiation treatments for
cancer.  Attorney Rosenberg still insisted that he could not
talk
to us on the phone or write a letter that explained what the
status was of the case.  We ask if we could meet in White
Plains at a local coffee shop or public library, but he still

refused to tell us anything. Then after 9 months he finally agreed to meet us at the DALCO Reporting Agency that was at 120 Hamilton Ave, White Plains, New York 10604.  For the very first time on November 12, 2010, my wife finally met Attorney Rosenberg.  When we sat down with Attorney Rosenberg he
told us that he wanted us to seek new counsel and told us that he would not go to trial.                              See Exhibit.

-10-

Addressing The Allegations Of Robert Rankel

Everything that I have stated to this committee is the truth.

A.                          Failure to Proceed to Trial

Two Supreme Court Judges yelled at Attorney Rosenberg and Ordered that this matter be recommended to be sent over to the Grievance Committee. See Judge Colabella's statement on Page 3 of the Court transcripts marked as my Exhibit.  Now on page 10 and 11 of the Court transcripts dated February 23, 2011, you'll see where Attorney Rosenberg says, "This case will fail, in addition, for failure of proof, for lack of having expert testimony." On Page 10 he says that because "he (Plaintiffs) refused to fund this and it's been almost a year that I have asked him about this." Not only is this statement untrue; but the fact of the matter is, we only learned about Attorney Rosenberg's demand for $20,000 on February 18, 2011, which was on the weekend; and he demanded the $20,000 in the form of a bank check delivered to his office by February 22nd 2011, the day before trial. See Exhibit dated February 17th, 2011, written by Attorney Rosenberg. Judge Colabella was very upset and told Attorney Rosenberg on Page 9 of the Court transcript that:  <u>"The Case is Going To Go Out For Trial Or I'm Going To Dismiss It."</u>

Judge Scheinkman of the Westchester County Supreme Court told Attorney Rosenberg that he had adjourned the trial in this case several times and allowed the case to languish after the case had trial dates after trial dates; and each time Attorney Rosenberg adjourned the matter. In fact, Attorney Rosenberg had adjournments that expanded over the whole 10-year period that he had the case.  See all adjournments. They were all adjourned and agreed to by County
Attorney Fay Jones.


-11-

Attorney Rosenberg's facts are very twisted in that he made us wait 9 months before finally agreeing to meet us In White Plains, and all the
time he had an office right in Hartsdale, New York and lived in Hartsdale as well.  He insisted that my sick wife and I travel down to the City.  We explained that it was at least a 2 ½-hour round trip.

His Memo was in complete contradiction to what he wrote in our Summons and Complaint.  Even his Argument at Point 1 was wrong in his answer to the Defendant's motion to dismiss our State law claims. "The General Municipal Law's Notice Of Claim Requirements, et, seg. Are Inapplicable To Claims Made Pursuant to 42 U.S.C under Section 1983. This is only correct as far as our Federal claims go, but not our State claims. Point ll  Attorney Rosenberg writes: " State Civil Rights Claims Are Not Subject To The Requirements Of The General Municipal Law"  Again, he is incorrect. See 50-h.

Point lll  Again attorney Rosenberg is wrong: He writes: "Defendants Indefinitely Postponed The 50-h hearing without

serving A Subsequent Demand Therefor, And, As Such, Plaintiff's State Tort Claims Should Not Be Dismissed."

Again he is wrong and could have corrected this by simply calling the County Attorney's Office In Sept of 2001 when I first brought it to his attention in his office, but he failed to contact them and set up a new 50-h hearing.

Faced with what background? The truth is he did not properly handle the case and failed to protect our rights, not doing proper discovery of the case or a proper investigation of the case, and allowed the case to be adjourned for over a 10 year period.  When he couldn't settle the case he did not want to spend $20,000 for experts or any witnesses.

In fact he never called any toxicologist, he told me, or any other experts; therefore, how could he possibly have marked the case ready

-12-

for trial and filed a Note of Issue and had the case
<u>CERTIFICATE OF</u>
<u>READINESS FOR TRIAL</u>?                    See Exhibit.

Attorney Rosenberg had prejudiced us from the very start when he failed to include the other defendants listed in our Retainer Agreement. Plus, the fact that he allowed all of our State law claims to be completely dismissed when he could have easily corrected everything by just calling the County Attorney and set up a 50-h hearing; instead he never bothered to contact them. The only reason he thought that the case was going to be dismissed is because he failed to do his job as a prudent person would have done under similar circumstances.  You can't win a case without having any witnesses for trial!  The other fact is, we had expert witnesses already that did all the testing but Rosenberg just never bothered to call any of them, including any of the non-

expert witnesses that we already had available.

When we were before Honorable: Scheinkman, Attorney Rosenberg's only argument then was that he claimed irreconcilable differences between the clients and your affirmant relating to the litigation strategy in this matter. Judge Scheinkman Ordered that he proceed to trial and denied attorney Rosenberg's Order To Show Cause. Not once did Attorney Rosenberg sit with us and became very hostile outside the Courtroom and told my wife and I that he had another planned
Order To Show Cause ready to go when we went before Honorable: Colabella, S.C.J. This time he threw everything but the kitchen sink at me, including talking about murder charges on page 10 and 11 of the Court transcripts. See Attorney Rosenberg's statements.

B.       Conspiracy and Lying To The Courts

It was not totally proper for Attorney Rosenberg to sit with the County Attorney Fay Jones throughout the Court proceedings. It was not proper for them to talk about getting the case dismissed. I sat a few
                              -13-
rows behind them and could hear them talk about getting the case dismissed. This was neither ethical nor proper, and it was a complete
conspiracy because Attorney Rosenberg knew that he had to get out of the case one way or another. Once he got the MEMO from his associate Stuart Di Martini in 2010, he decided to just dump the case once he couldn't settle the matter with the County Attorney.

The County Attorney's Office knew that they didn't need to settle the case because Attorney Rosenberg had no experts to call even if there was a trial. There was no notice given of

any expert witnesses or non-experts listed in the case
according to the record and according to what attorney
Rosenberg stated to the Court. See Exhibits.

Again, Attorney Rosenberg is not being truthful when he
states on Page 7 of the Court transcripts dated February 23,
2011, that : " It Was The County Attorney Who Advised The
Court Of This Situation."   The Court (J. Colabella) says:
"The Case Is Going To Go Out For Trial, Period."   That's
when Rosenberg intentionally called the County Attorney,
Jones, by saying: "Counsel, I Believe, Has A Statement,
Also, Which Is Super-Sensitive, And I Believe That You
Share My Request To See Him In The Robing Room."  Prior
to that, there was no talk or conversation about Arsenic
Poisoning until
Attorney Rosenberg made the County Attorney go into it,
knowing that

the facts had already been determined as UNFOUNDED;
and the case was completely dismissed on February 28,
2001, of all charges, including the family Court Charges and
the Criminal matter that was before the Grand Jury,10 years
ago. Both attorneys knew that the Rankel family had suffered
a great injustice by being falsely accused by Westchester
County, CPS, and Bellevue Hospital; yet they both
hammered away at getting the case dismissed at any cost,
knowing that there was no attempted murder or any arsenic
poisoning.  They knew it was a lab error right after Bellevue
had admitted it.  The dismissal was also based upon all the
other lab experts' findings.
                               -14-
Rosenberg's own draft of the factual background stated that
Bellevue Hospital had indicated that: "It is possible that the
high arsenic level
on admission was due to a normal seafood diet or it could be
lab error."  The County Attorney Jones knew this as well as

Rosenberg.  Rosenberg continued to go on and on before Honorable Colabella about his client being indicted for attempted murder. They also knew that under the 5th amendment a defendant cannot be charged twice for the same offense 10 years later.

On January 10, 2011, when we were before Honorable Scheinkman, Attorney Rosenberg said: "The Rankel Family Has A History Of Arsenic Poisoning."  I couldn't believe that this was the same attorney that we had hired in 2001.  He was being completely dishonest and untruthful with the courts.

What I find even more disturbing is the fact that Mr. Rosenberg is
continuing his dishonesty by being untruth with this committee. I guess this is why he calls himself the legal pit bull, like some wild dog out of control.

C.          <u>Failure To Retain Expert Witnesses</u>

Not only did Attorney Rosenberg fail to retain expert witnesses, he failed to contact even non-expert witnesses. Plaintiffs had already paid for expert witnesses who did all the toxicology work and investigative work in this matter, but Attorney Rosenberg didn't even pick up the phone to ever call them or write to them. Plaintiff also had paid for experts that could have testified that CPS did not follow their own procedures or protocol; but Attorney Rosenberg never contacted those experts, knowing that he would have to pay those experts.  Once again, Attorney Rosenberg had always advanced all the fees in the past, and he never told us about this $ 20,000 trial expense until the eve of trial.

-15-

I looked through the whole file and there is not even a Pre-

Trial list
anywhere in this file. This file he sent me is not only incomplete but
has been carefully Cherry Picked in order to cover up the truth.  There is not even a copy of the original 50-h hearing Notice that I handed him back in Sept of 2001.

Attorney Rosenberg doesn't even dispute the fact that I gave him the original copy of the 50-h hearing Notice on Sept 18, 2001, with the whole file left with him.

Our whole family had seen a social worker and a licensed psychologist after Christina, Carla and Claire were returned. See Page 94 of Robert Rankel's Deposition under description Cost of social worker, Cost of psychologist, including the location of Christina's job that she lost and her lost earnings.  The correct spelling is Detective Leneau of the Yorktown PD.  Attorney Rosenberg never contacted any of these witnesses.  These questions were all asked by County Attorney Fay Jones.

The Deposition was dated May 4, 2006.  Attorney Rosenberg was not even there to do the Deposition or prepare the kids for these Depositions.  See Depositions of Christina, Carla, and Claire that were taken by the County Attorney Jones.

Our experts were never called or contacted by Attorney Rosenberg in the whole 10 year period that he handled the case. He had all the experts' names, addresses, reports, etc.

He never contacted the Yorktown Laboratory expert, Al Padovani, who had testified at the Grand Jury for us and who we had hired in 2001.

On June 29, 2009, Attorney Rosenberg writes that all the pleadings served was completed; Bill Of Particulars served

was completed;  Physical Examinations were waived,
Medical Reports Exchanged was
                            -16-
completed; and Appraisal Reports Exchanged was, he
writes, not applicable.  He writes that Discovery proceedings
were completed?

<u>Certificate Of Readiness For Trial</u>

Failure to contact Hudson Valley Hospital and get witnesses
that diagnosed Claire with Lyme Disease on Sept 18, 2000
to 2001; this may have been the real reason why she got
sick.  Failure to contact Cardinal McCloskey Group Home,
where Christina had been badly beaten.  Mr. Rosenberg had
the names and address of all the witnesses and never
contacted any, including this group home, nor investigated
the matter or even claimed her injuries on the list of the Bill
Of Particulars or on the Pre-Trial list of persons to call,
because he was neglectful of his duties to his clients.

Even Attorney Rosenberg's own associate wrote:  "this case
needs an expert to determine what was really going on in
terms of the types
of tests that were done and the types of arsenic".  See
Exhibit dated
October 31, 2002, by Stuart DiMartini in his MEMO to DBR
(Donald B.
Rosenberg).  Rosenberg failed to take the legal advice of his
own associate.

D.        <u>Agreement To Pay All Disbursements</u>

Attorney Rosenberg agreed to pay all expenses and did so
throughout  the case for 10 years without ever telling us
anything about wanting a $ 20,000 separate Retainer on top
of our original Retainer Agreement. We got his Notice on the

eve of trial which was on the weekend and only 2 business days before Jury Trial started on February 23, 2011.  The facts and circumstances never changed from 2001.

The Retainer Agreement stated that it was based upon a One Third Contingent Retainer Agreement.  See Exhibit.  All the expenses were always paid by Attorney Rosenberg.  Our Retainer Agreement

-17-

never stated that we would have to pay $ 20,000 the day before trial,  and we never received proper notice.  We never even got a copy of
the Retainer Agreement until after Attorney Rosenberg had our case completely dismissed for his refusal to pick a jury panel.  See Exhibit.

In fact, if you read the Retainer Agreement it states clearly that:
"The Client hereby gives you the exclusive right to take all legal steps to enforce this claim through trial and appeal."
"The attorney shall have the right but not obligation to represent the Client on appeal."

"Thirty-Three and one third (33-1/3%) of the sum recovered, whether by suit, settlement or otherwise."  See Retainer Agr.
"Such percentage shall be computed on the net sum recovered after deducting from the amount recovered expenses and
disbursements for expert testimony and investigative or other services properly chargeable to the enforcement of the claim or prosecution of the action."

Nowhere in the Retainer does it state that the client is responsible
to pay all trial expenses or expert witnesses expenses up front.

This was never the agreement or the meeting of the minds.
Attorney Rosenberg had said that any expenses, including trial
expenses would be all computed on the net sum of the recovery.
The fact that Mr. Rosenberg had paid for all the expenses right
up to the February 23, 2011, trial date and never once told us that
we would now, for the very first time be responsible to pay him a
separate retainer of $ 20,000 on the eve of trial.  This was not part of our agreement, and not a reasonable demand.

The truth is that attorney Rosenberg didn't want to obey the Judge's Order to pick a jury because he knew that he had screwed up the case by not doing a proper Discovery, allowing all of our State law claims to be dismissed, also not including

-18-

Bellevue Hospital that was in our Retainer Agreement, not contacting witnesses or experts, etc.

The County Attorney knew that he had screwed up the case, and that's why they would not settle.  You can't win a case or settle a case if you don't do what's required in that case; and Rosenberg failed to do the necessary work that had to be done. Even his own associate, Stuart Di Martini, said that we need expert testimony on the type of tests that were done and what the different types of arsenic were.  See Exhibit.

E.                    Duration of This Matter

The entire record is full of adjournments; year after year he had adjourned the case time and time again without any explanation to us as to why he had to keep adjourning the

matter year after year? For 10 long years this case was
intentionally dragged out through the courts from one judge
to another for and causing us more grief and more hardship
that was completely uncalled-for.

His actions greatly prejudiced our case; and even the judges
were getting sick and tired of his adjournments and stall
tactics year after year.  Mr. Rosenberg writes that he admits:
"This Case Has a Long History."  Yes, a long history that he
caused because of his failure to be diligent, failure to be
reasonable in providing proper care as a reasonable person
would have done under similar conditions, failing in his legal
responsibilities and fiduciary duties that he owed to his
clients, and to the courts.  In fact two Supreme Court Judges
yelled at him on 2 separate occasions and Ordered that he
either start picking a jury or that the case was going to be
dismissed for attorney Rosenberg's failure to comply to the
Judges' demands. See Honorable Scheinkman Decision and
Order dated January 10, 2011, and

-19-

then see the transcripts of what Honorable Colabella had to
say on February 23, 2011. The record speaks for itself.  See
Exhibits.

F.     Failure to Interview The Rankel Children

In 10 years Attorney Rosenberg never interviewed our
children, who were all minors when he took the case in 2001.
Mr. Rosenberg never once asked to see our children or talk
to them in all those years.  They were never even prepared
by Attorney Rosenberg when his associate, Stuart Di Martini,
took their Depositions on May 9, 2006. Also he never gave a
retainer to our kids after they turned 18. See Depositions of
Christina, Carla
and Claire that he claimed was never taken. See Exhibits.

G.          Failure To Name Bellevue Hospital

Once again, Attorney Rosenberg is mistaken, when I first spoke to him in September of 2001, he arranged that I meet him at his office with my file and the 50-h hearing papers. On Sept 18, 2001, I met Attorney Rosenberg at his Manhattan office, located at 630 Third Ave. New York, N.Y.  I remember it very clearly because it was over 65 minutes one way by train and another 10-15 minute walk to his office.  I carried the file up to his office, and the very first thing I remember is before I even sat down I pulled the 50-h notice from the file and told him that I needed him to call the County Attorney's Office to schedule my 50-h hearing. I told him that I spoke to the County attorney's office requesting time to get an attorney to represent my family, he said that he would call.  Attorney Rosenberg and I sat in his office and I had explained all the past involvement with CPS, Westchester County, and my past conviction when I was a young kid, the events leading up to our kids being taken away, etc.  I was upfront with him and expected him to be upfront too, but he never was with us.

-20-

We spoke about all the named parties that he would include in the Summons and Complaint that included Bellevue Hospital, Rebecca Weitman who worked at Bellevue and Susan Berger of Westchester County's CPS unit.  See the Deposition taken of
Rebecca Weitman dated June 27, 2006.  Bellevue Hospital was in our Retainer Agreement, and I never agreed to allow them out of our case, and there is nothing in the whole record that says that anywhere.

Second: Attorney Rosenberg is mistaken, I went to Western Connecticut College and took legal writing and analysis; plus

I took business law courses, and my great-grandfather was a judge
for over 30 years. I did draft a Civil Action under 42 USC Section 1983 after our family was falsely accused of poisoning our own 3 daughters, our children being taken away from February 1 to February 28, 2001, we were all traumatized and now made to suffer even further by Donald B. Rosenberg negligence.

Third: Rosenberg's Exhibit (i) does not state that we approved anything. In fact we wrote him letters asking him why he didn't included Bellevue Hospital, Rebecca Weitman, and Westchester county's CPS worker Susan Berger who was directly involved with the whole situation.  See Exhibit letters.

H.       Failure To Interview Bellevue Personnel

Again, Mr. Rosenberg is being untruthful to this Committee. Please See our Exhibit dated June 27, 2006, Deposition of Rebecca Weitman of Bellevue Hospital, taken by Stuart DiMartini of the law firm of Vogel and Rosenberg.

-21-

I.       Failure To Respond to 50-h Hearing Notice

See Memorandum written by Stuart DiMartini to DBR dated 9/26/2002, Page 3.  He states that a late Notice of Claim could be filed against Bellevue Hospital; but they both decided
to dump all of our State law claims and just focus on the Federal claims, according to his Memorandum to his boss. They could have easily corrected the Notice of Claim by

serving a Late
Notice.  Attorney DiMartini stated on page 3 that the year
and 90 days would have expired approximately May 1, 2002.
Therefore, they both realized that they both failed to file the
proper late Notice of Claim, which was yet another error on
Attorney Rosenberg's part.  See Exhibit.

Also, another error by Attorney Rosenberg is the fact that I
never filed any CPS petitions against my family; it was CPS
that filed
false allegations against us that were all unfounded,
dismissed and sealed by the Court. He was told this before
he took the case.

J.       **Failure To Give The Rankels Their File**

We waited months for Attorney Rosenberg to give us our file.
When we got the file, we found that it was incomplete and
that some of the documents are still missing.  He finally sent
us a copy of our Retainer Agreement that he never gave us
until he had the case dismissed for his failure to obey the
Court's direction for him to pick a jury on February 23, 2011.

K.       Failure To Speak To Attorney Mitch Lieberman

Again, Attorney Rosenberg is not being truthful to this
Committee.  He did not speak with Attorney Lieberman.
Attorney Lieberman was retained by me for my family back in
2001.  Attorney Lieberman did a wonderful job in getting
back our children and
                                 -22-
proving that Bellevue Hospital and Westchester County were
both wrong.  See our Exhibit that proves that Rosenberg is
again wrong.

L.       Date Change Of Retainer

Attorney Rosenberg never even gave us a copy of the
Retainer until after the case was dismissed.  As far as the
date goes; I did
go to his office on Sept 18, 2001, and he did accept our case
from that point on.

The only person who has no credibility is Attorney
Rosenberg.

I'll leave the conclusion up to this Honorable Committee to
decide.
Wherefore: for all the reasons stated and in the interests of
justice and furtherance of Justice we pray that this
Committee issue a complete investigation of this matter.


Respectfully submitted,


Robert Rankel


Dated May 23, 2011

CC:  File

Robert Rankel
20 Sun Hill Rd.
Katonah, N.Y. 10536


April 18 , 2011

Re: Index No. 18880/03


Honorable: Scheinkman J.S.C.
Westchester County Supreme Court
111 Grove Street
White Plains, NY 10601



Dear Honorable : Scheinkman,


We are the plaintiffs who were before you on January 10, 2011.
With respect to the above matter we are enclosing a copy of a letter
that we sent to Judge Colabella on April 11, 2011.
Our case was dismissed on Feburary 23, 2011 because our attorney,
Donald Rosenberg refused to pick a jury even after you told him that
he had a duty to represent our family with vigor.
After your honor dismissed attorney Rosenbergs Order To Show
Cause on January 10th 2011, attorney Rosenberg  went into a rage
outside the courtroom and confront me and my wife and told us that
he had yet another Order To Show Cause already planned and that
he was not going to trial or picking a jury in this case no matter what.
He was very hostel when he spoke to us and never once sat with us
thru out all the Court proceedings before your Court and Judge
Colabella's Court. In fact, he sat with the County attorney most of the
time when we were before Judge Colabella on February 23, 2011.
I just want to make a record of what transpired and pray that  this
Court will Order an investigation into this matter and if its all possible
that we be allowed to either reargue r file for summary judgement.
Attorney Rosenberg and the County Attorney both conspired to get
this case dismissed, and its just not ethical what they did.

We are not sure if we can even reargue this matter because attorney Rosenberg screwed up our case and did not do a proper discovery or a proper investigation of the facts, including failing to contact witnesses, failing to be honest to plaintiffs, failing to be honest to the Courts, and failing to provide a reasonable degree of care in this case. Attorney Rosenberg never even gave us a copy of the retainer agreement until after he allowed the case to be dismissed.
Im writing in the interests of justice because we were wrongfully accused and our children all taken away and abused while in the custody of westchester county and the dept of social services.

Wherefore: we pray that the court order a complete investigation into this matter and allow us to either reargue or file for summary judgement.

Dated April 18 , 2011                    Respectfully Submitted,

                                         Robert Rankel

CC:  File

Robert Rankel
20 Sun Hill Rd.
Katonah, N.Y. 10536


March 28, 2011


PRELIMINARY STATEMENT,
Amended Complaint & Exhibits
Against Donald B. Rosenberg, Esq.


Jorge Dopico, Chief Counsel
Departmental Disciplinary Committee
First Department
61 Broadway, 2nd Floor
New York, N.Y. 10006


Dear Mr. Dopico:

I would like to explain to this Committee what my former attorney

Donald B. Rosenberg did in a case he was handling for myself,

Anne, Christina, Carla and Claire.

When I first retained Attorney Rosenberg in Sept. of 2001, he had

agreed to represent our family and my wife and infant daughters

against Bellevue Hospital and against Westchester County on a one-

third retainer agreement. He had agreed to pay for all expenses up

front and he had said that he was a pit bull in the courts and had over

40 years of trial experience and would get us the highest award